Neal K. Carter (AZ#034200)
NEAL K. CARTER, ESQ
P.O. Box 245
Queen Creek, AZ 85142
(480) 628-1037
neal@nealkcarteresq.com

Neal Cornett (DC# 1660201)*
THE OVERSIGHT PROJECT
2033 K. Street NW, Ste 250
Washington, DC 20006
(606) 275-0978
neal@itsyourgov.org

*Admitted pro hac vice

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Winn, Chairwoman of the Pima County Republican Party, and the Pima County Republican Party )<br><br>Plaintiffs, )<br><br>vs. )<br><br>Adrian Fontes, in his official capacity as Arizona Secretary of State; Kris Mayes, in her official capacity as Arizona Attorney General )<br><br>Defendants. ) | Case No.: CV-2603108-PHX-MTL<br><br>**DECLARATION OF JOEL STRABALA ON BEHALF OF THE PIMA COUNTY REPUBLICAN PARTY** |

I, Joel Strabala, declare as follows:

1.    I am the Chairman of Legislative District 17 for Pima County Republican Party ("the Party"). I am authorized to make these statements on behalf of the Party.

2.    I am competent to testify as to the matters contained herein and make this declaration based on my personal knowledge and the Party's records created in the normal course of business.

3.      I am a veteran that served 12 years active duty as a fighter pilot in the U.S. Air Force. I attained the rank of Major (O-4). I remain active in the military and veteran communities in Pima County and Arizona.

4.      The Party works in Pima County to promote voter participation and observe the conduct of elections.

5.      The Party trains volunteers and poll watchers on election integrity laws and issues at polling places including voter challenges and electioneering. Volunteers and poll watchers are trained to comply with all applicable Arizona statutes and regulations, including the 2025 Elections Procedures Manual required by A.R.S. § 16-452.

6.      The Party has conducted political party observer training in the past and intends to do so prior to the July and November 2026 elections.

7.      All training materials are designed to ensure poll watchers and volunteers comply with applicable Arizona law.

8.      The Party's training and compliance efforts must be tailored to comply with the 2025 Elections Procedures Manual ("the EPM").

9.      In particular, the Party must train poll watchers and volunteers to comply with the speech restrictions contained in Chapter 9, Section III.A ("Electioneering Ban") and Chapter 9, Section III.D ("Political Speech Restrictions") of the EPM.

10.     Due to the vagueness and overbreadth of the Political Speech Restrictions and the Electioneering Ban, it has been difficult to draft training material to comply with the EPM.

11.     To comply with the Electioneering Ban, Party members must be trained to ensure that legitimate electioneering outside of the 75-foot limit established in A.R.S. § 16-515 is not "audible from a location inside the door to the voting location." EPM at 202.

12.     Neither the Attorney General nor the Secretary of State provided limited guidance for the Electioneering Ban, providing only the clear example that:

if someone brings a megaphone to a voting location, stands 76 feet away, and announces "Vote for Trump!" or "Vote for Biden!" so that people inside the door to the voting location can hear, that person would likely be violating the statutory ban on electioneering because the

person would be knowingly communicating their electioneering message well within the 75-foot limit.

See ECF No. 1-7 at 4.

13. Other than this obvious example, the Party has no guidance on where the line will be drawn on acceptable and unacceptable electioneering practices.

14. Due to this restriction on electioneering, the Party believes that any in-person electioneering at voting locations, even that clearly permitted by A.R.S. § 16-515, might subject voters and party members to criminal sanction.

15. The Political Speech Restrictions in the EPM also present several problems. The EPM tasks marshals with the responsibility of "preserv[ing] and remov[ing] persons engaging in voter intimidation, threats and coercion . . . from the voting location." EPM at 204. The EPM provides several examples of actions that seem to constitute intimidating conduct, including:

- Aggressive behavior, such as yelling at or taunting a voter or poll worker;

- Using threatening language to a voter or poll worker;

- Blocking the entrance to a voting location;

- Disrupting voting lines;

- Following voters or poll workers coming to or leaving a voting location, including to or from their vehicles;

- Intentionally disseminating false or misleading information at a voting location, such as flyers or communications that misstate the date of the election, hours of operation for voting locations, addresses for voting locations, or similar efforts intended to disenfranchise voters;

- Impersonating a law enforcement officer or otherwise wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters (see also A.R.S. § 26-170, prohibiting unauthorized wearing of national guard or U.S. armed forces uniform);

- Directly confronting, questioning, photographing, or videotaping voters or poll workers in a harassing or intimidating manner, including when the voter or poll worker is coming to or leaving the polling location;

- Asking voters for "documentation" or other questions that only poll workers should perform; or

- Raising repeated frivolous voter challenges to poll workers without any good faith basis, or raising voter challenges based on race, ethnicity, national origin, language, religion, or disability.

EPM at 204–205.

16.    The EPM provides only that "the inspector and/or marshal must use sound judgment to decide whether to contact law enforcement, and any higher-level decisions should be raised through the officer in charge of elections." EPM at 204.

17.    The Attorney General and Secretary of State provided limited guidance on how the EPM's Political Speech Restrictions will be implemented and instead cited to various penal provisions of the Title XVI of the Arizona Statutes.

18.    The Party must train volunteers, voters, and political party observers to comply with the Political Speech Restrictions.

19.    As an example, the Party advises political party observers and voters to refrain from expressing frustration with long lines as it may be considered "aggressive behavior toward poll workers" and subject the voter to removal or criminal penalty.

20.    The Party is particularly concerned about the impact of this apparel restriction on military personnel.

21.    Pima County is home to Davis-Monthan Air Force Base, Tucson, AZ, and the Arizona Air National Guard's 162nd Wing, Tucson, AZ. It is not uncommon for military personnel from these organizations to vote in dress uniforms, operational camouflage pattern, or flight suits.

22.    The EPM specifies wearing uniforms as potentially intimidating conduct and I am concerned that election officials may turn uniformed personnel away from voting locations or contact law enforcement.

23. Historically, veteran voters tend to vote for Republican Party candidates. Polling by Pew Research conducted before the 2024 Presidential Election found 61% of veteran voters supported President Donald Trump's campaign while 37% supported then-Vice-President Harris' campaign. This is in line with prior polling that found 60% of veteran voters supported President Trump, while 39% supported former President Joe Biden's campaign in 2020. In 2016, veterans supported President Trump over former Secretary of State Hillary Clinton 61% to 35%. Ex. 1, Joseph Copeland, *Military veterans remain a Republican group, backing Trump over Harris by wide margin*, Pew Research Center (Sep. 30, 2024), https://www.pewresearch.org/short-reads/2024/09/30/military-veterans-remain-a-republican-group-backing-trump-over-harris-by-wide-margin/.

24. President Trump appears to have maintained this veteran voter preference for Republican party candidates. Recent polling by Rasmussen Reports and Veteran Action found 60% of likely U.S. Military Voters, which includes current and former service members, approve of the job President Trump is doing. 57% responded that they would vote for a Republican candidate for Congress, while 35% responded they would for a Democrat candidate. Ex. 2, *Trump Approval at 60% Among Military Voters*, Rasmussen Reports and Veteran Action (March 25, 2026), https://www.rasmussenreports.com/public_content/politics/partner_surveys/trump_approval_at_60_among_military_voters.

25. The Party is concerned that voters turned away for voting in uniform will disproportionately be Republican voters.

26. I am also concerned that election officials may consider a police officer, deputy sheriff, or corrections officer voting in uniform as intending to deter, intimidate, or harass voters and subject the voter to removal or criminal sanction.

27. Similarly, the Party must advise political party observers to be cautious of what they wear. An observer may be removed because election officials consider their apparel intimidating.

28. The Party's efforts at election observation are frustrated by the nebulous prohibition on "repeated frivolous voter challenges to poll workers without any good faith basis."

29. Based on vague EPM language, the Party cannot reasonably determine permissible voting challenges.

30. As examples, the following are instances of conduct party observers are trained to recognize as warranting a challenge:

- Election officials failing to address people entering a vote center who are disruptive or display violent behavior;
- Raising concerns that a significant number of voters are having difficulty with check-in or are unable to vote;
- An individual poll worker repeatedly being asked to provide voting assistance when no others are asked;
- Election officials refusing to allow observers at a voting location to observe opening and closing operations;
- Voters delivering multiple early ballots, beyond what is considered reasonable for a normal household;
- Election officials refusing to answer observer questions; and
- Election officials refusing to discuss and/or mitigate an issue raised by an observer.

31. Such challenges are more likely to occur at voting locations with inadequate staffing and inadequate staffing was an issue in the March 2026 special elections at the following locations:

- Recorder's Country Club Location, 6550 S. Country Club Drive, Tucson, AZ
- City of Tucson, Ward 2 Office, 7820 E. Broadway Blvd, Tucson, AZ
- Mobile Voting Center, Countywide

32. Raising such challenges more than once may now lead to our observers being removed for "repeated frivolous voter challenges."

33. If a political party observer is removed, there are no established procedures for the Party to identify an alternate observer to replace them. Observers are essential to document challenges and provide the record for any future administrative or legal proceedings.

34. The EPM's Electioneering Ban and Political Speech Restrictions place direct costs on the Party in the run-up to the July and November 2026 elections. The Party must (1) devote resources to understand what actions are prohibited by the Electioneering Ban and Political Speech Restrictions; (2) modify training to account for the Electioneering Ban and Political Speech Restrictions; and (3)

train party members to ensure good-faith efforts to comply with the Electioneering Ban and Political Speech Restrictions

35. Complying with the Electioneering Ban raises concerns that certain legitimate volunteer activity may become subject to criminal liability. The Party is concerned that a volunteer or observer may be subject to criminal penalty for innocuous behavior such as speaking too loudly. *See* EPM at 202.

36. The Electioneering Ban as applied to areas outside the 75-foot limit but "audible from a location inside the door to the voting location" enables election officials to remove or request law enforcement remove and potentially arrest individuals engaged in constitutionally protected speech based on nothing more than a claim that the actions are "audible."

37. Moreover, as a result of the Electioneering Ban and Political Speech Restrictions, the Party's training materials must err on the side of caution and direct poll watchers and volunteers to refrain from conduct protected by the First Amendment. But for these provisions, the Party would not need to incur additional compliance costs and direct its members to self-censor.

38. The Electioneering Ban and Political Speech Restrictions were questioned by several organizations during the EPM's public comment period. *See* ECF Nos. 1-1, 1-2, 1-3, & 1-4. The Secretary of State submitted the EPM to the Governor and Attorney General for approval without addressing these concerns. *See* ECF No. 1-5.

39. Following the approval of the EPM, the Party submitted a letter through counsel to the Secretary of State and Attorney General requesting disavowal of the Electioneering Ban and Political Speech Restrictions. ECF No. 1-6.

40. The Secretary of State and Attorney General did not disavow enforcement of the Electioneering Ban and Political Speech Restrictions and instead characterized both as mere descriptions of relevant statutory language. ECF No. 1-7.

41. It is the view of the Party that the Electioneering Ban and Political Speech Restrictions are unacceptable and severe prohibitions on protected speech that violate the United States Constitution.

42.    For similar reasons, it is the view of the Party that the Electioneering Ban and Political Speech Restrictions cannot be applied in an evenhanded fashion and therefore violate both the Due Process and Equal Protection Clauses of the United States Constitution.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15th day of May, 2026.

By: */s/ Joel Strabala*
Joel Strabala, Chair, LD 17
Pima County Republican Party