KRISTIN K. MAYES
Attorney General
(Firm State Bar No. 14000)
Office of the Arizona Attorney General
2005 North Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333

Karen J. Hartman-Tellez (021121)
Kara Karlson (029407)
Kyle Cummings (032228)
Karen.Hartman@azag.gov
Kara.Karlson@azag.gov
Kyle.Cummings@azag.gov
Adminlaw@azag.gov
*Attorneys for Defendant Adrian Fontes*

Joshua M. Whitaker (032724)
Syreeta A. Tyrell (034273)
Jaylia Yan (041148)
Joshua.Whitaker@azag.gov
Syreeta.Tyrell@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov
*Attorneys for Defendant Kristin K. Mayes*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Winn, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Adrian Fontes, *et al.*<br><br>Defendants. | No. CV-26-03108-PHX-MTL<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Defendants Adrian Fontes, in his official capacity as Arizona Secretary of State, and Kris Mayes, in her official capacity as Arizona Attorney General, hereby respond to Plaintiffs' Motion for Preliminary Injunction.  The Court should deny the Motion for three reasons.  First, Plaintiffs have not made a clear showing of standing.  Second, Plaintiffs are unlikely to succeed on the merits, and equitable factors counsel against an injunction.  Third, the scope of Plaintiffs' requested injunction is overbroad.

**INTRODUCTION**

Voters have a right to cast their ballot without undue interference and people have a right to engage in political speech.  *See Burson v. Freeman*, 504 U.S. 191, 211 (1992); *Reynolds v. Sims,* 377 U.S. 533, 554 (1964).  Sometimes these two rights conflict.  When they do, the Supreme Court has come down on the side of voters and upheld states' efforts to set polling places aside as "island[s] of calm in which voters can peacefully contemplate their choices."  *Minn. Voters All. v. Mansky*, 585 U.S. 1, 15 (2018).

Indeed, to ensure that elections remain free and fair, both Arizona and federal statutes have long balanced the rights of voters against the rights of those wishing to influence how people vote.  In particular, state and federal law prohibit attempts to intimidate voters.  *See* A.R.S. §§ 16-1006, -1013, -1017; 18 U.S.C. § 594; 52 U.S.C. §§ 10101(b), 10307(b), 20511; *see also* 18 U.S.C. § 241; 42 U.S.C. § 1985(3).  Arizona statutes also provide for a 75-foot zone outside the entrances to voting locations, where electioneering (*i.e.*, attempts to verbally persuade voters for whom to vote) is prohibited.  *See* A.R.S. § 16-515(A), (I).

Plaintiffs do not challenge these statutes.  Instead they challenge parts of Arizona's 2025 Elections Procedures Manual (the "EPM").  But the EPM merely *describes* the abovementioned statutes to help election officials identify possible violations.  Contrary to Plaintiffs' suggestions, the EPM does not expand the scope of unlawful intimidation or electioneering beyond what the statutes themselves prohibit.  Moreover, the EPM's description of the statutes is *accurate*.  The EPM provisions concerning voter intimidation

and electioneering have been in place for years, and Plaintiffs identify no situation where any election official has applied (or will apply) them in a manner inconsistent with either the statutes or the Constitution.  Nevertheless, Plaintiffs ask this Court to enjoin EPM subsections Ch. 9, §§ III.A & III.D.  The Court should deny this request for three reasons.

*First*, Plaintiffs have not made a clear showing of standing.  They have not shown that they have actually suffered (or will imminently suffer) a concrete injury.  Nor have they shown that any such injury would be caused by the EPM itself as opposed to the statutes that the EPM describes.  *Second*, Plaintiffs are unlikely to succeed on the merits, and equitable factors counsel against an injunction here.  Importantly, Plaintiffs are asking the Court to enjoin the challenged EPM sections in *all*, not just specific, situations. Because they are making a facial challenge, Plaintiffs have a steep burden on the merits, and they do not meet that burden here.  In addition, Plaintiffs have not shown that an injunction is necessary to prevent irreparable harm,  And the balance of the equities and the public interest weigh heavily against an injunction.  *Third*, the scope of Plaintiffs' requested injunction is overbroad.  Although their Motion aims at small fragments of the challenged EPM subsections, they ask the Court to enjoin those subsections in entirety. Indeed, they even ask the Court to order Defendants to produce a new EPM, an invitation this Court has previously and correctly declined.  *See Am. Encore v. Fontes,* No. CV-24-1673-PHX-MTL, 2024 WL 4333202, at *26 n.11 (D. Ariz. Sept. 17, 2024).  So, even if Plaintiffs are entitled to an injunction of some kind, the Court should deny the overbroad injunction they seek.

## BACKGROUND

**I.    State and federal law have long restricted voter intimidation and electioneering in and around polling places.**

To maintain free and fair elections, from the advent of statehood, Arizona law has prohibited efforts to intimidate voters, as well as electioneering in the vicinity of voting locations.

In 1913, Arizona's First Legislature adopted a Penal Code prohibiting voter

intimidation:

> 44. ***It shall be unlawful for any person***, directly or indirectly, . . . to make use of any force, violence or restraint, or to inflict or threaten the infliction . . . of any injury, damage, harm or loss, or ***in any manner to practice intimidation*** upon or against any person, in order ***to induce or compel such person to vote or refrain from voting*** for any particular person or persons, measure or measures, at any election provided by law, or on account of such person having voted or refrained from voting at any such election.

> 60. ***Every person who, by force, threats,*** menaces, bribery, ***or any corrupt means***, either directly or indirectly, ***attempts to influence any elector in giving his vote, or to deter him*** from giving the same, ***or attempts by any means whatever to awe, restrain, hinder or disturb any elector in the free exercise of the right of suffrage*** . . . ***is guilty*** of a felony.

Rev. Stat. of Ariz. (1913), Penal Code, Part I, Title IV, §§ 44, 60 (emphases added).[1]

These provisions have remained part of Arizona law with very few changes. Today, they are in A.R.S. § 16-1013 and A.R.S. § 16-1006 respectively. Federal statutes also prohibit voter intimidation. *E.g.*, 18 U.S.C. § 594; 52 U.S.C. §§ 10101(b), 10307(b), 20511; *see also* 18 U.S.C. § 241 (unlawful conspiracy against rights); 42 U.S.C. § 1985(3) (unlawful conspiracy to interfere with civil rights).

Since 1913, Arizona has also restricted electioneering near voting locations by:

- Setting a "fifty-foot limit" around each voting location on Election Day and generally prohibiting people from being in that limit "except for the purpose of voting";
- Prohibiting public "electioneering" within 150 feet of each voting location; and
- Prohibiting attempts to "interfere" with voters and attempts to "induce" voters to vote a certain way at voting locations.

Rev. Stat. of Ariz. (1913), Civil Code, Title XII, Ch. 8, §§ 2952, 2968, 2970.[2]  The 1928

---

[1] A copy of the 1913 Penal Code, Part I, Title IV, is included as Exhibit A.  The entire 1913 Penal Code is online at https://azmemory.azlibrary.gov/nodes/view/38231.

[2] A copy of the 1913 Civil Code, Title XII, Ch. 8, is included as Exhibit B.  The entire 1913 Civil Code is online at https://azmemory.azlibrary.gov/nodes/view/38228.

Revised Code expanded these restrictions on attempts to "interfere" with voters and attempts to "induce" voters to vote a certain way applied anywhere in the 50-foot limit around voting locations—not just in the voting location itself.  *See* Rev. Code of Arizona (1928), Part II, Ch. 22, Art. 5, §§ 1208, 1220.[3]

Today, similar provisions remain, but now the relevant distance is 75 feet from the voting location.  One statute prohibits "electioneering" within 75 feet.  A.R.S. § 16-515(A), (F).  Another prohibits "interfer[ing]" with voters and attempting to "induce" voters to vote a certain way within 75 feet.  A.R.S. § 16-1017(2), (3).

**II.     The EPM has described the statutory restrictions on voter intimidation since 2019 and on electioneering since 2014.**

Every two years, the Secretary of State issues an EPM upon approval of the Governor and Attorney General.  *See* A.R.S. § 16-452.  The purpose of the EPM is to ensure correctness, impartiality, uniformity, and efficiency in voting procedures, among other subjects.  A.R.S. § 16-452(A).

**A.     The EPM's description of voter intimidation statutes**

Since 2019, the EPM has included a subsection titled "Preventing Voter Intimidation."[4]  In the 2019 version, this subsection listed examples of conduct that "may" be considered intimidating.  (Ex. D (2019 EPM, at 180-81).)  Examples included:

- "Aggressive behavior, such as raising one's voice or taunting a voter or poll worker,"
- "Using threatening, insulting, or offensive language to a voter or poll worker,"
- "Directly confronting or questioning voters in a harassing or intimidating manner," and
- "Raising repeated frivolous voter challenges to poll workers without any good faith

---

[3] A copy of the 1928 Revised Code, Part II, Ch. 22, Art. 5, is included as Exhibit C.  The entire 1928 Revised Code is online at https://azmemory.azlibrary.gov/nodes/view/38235.

[4] All recent versions of the EPM, including the 2019, 2023, and 2025 versions, are available at https://azsos.gov/elections/about-elections/elections-procedures/epm.

4

basis."

*Id.*

The 2023 version of the EPM listed similar examples and added others, including: "Impersonating a law enforcement officer or otherwise wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters." (*See* Ex. E (2023 EPM at 181-83).)

In 2024, this Court granted a preliminary injunction against *parts* of this subsection in the 2023 EPM. *See Am. Encore*, 2024 WL 4333202, at *1. Specifically, this Court expressed concern with two provisions:

1. The subsection began with a broad sentence: "*Any* activity by a person with the *intent or effect* of threatening, harassing, intimidating, or coercing voters (or conspiring with others to do so) inside or outside the 75-foot limit at a voting location is prohibited. A.R.S. § 16-1013."

2. The subsection included "raising one's voice" and "insulting" or "offensive" language as possible examples of intimidating conduct.

*See id.* at *21–24 (emphases added).

To address the Court's concerns, in the 2025 EPM, the Secretary removed the broad sentence at the beginning of the subsection, and it does not list "raising one's voice" or "insulting" or "offensive" language as examples of conduct that may be intimidating. (*See* Doc. 21-2 at 203-05).) Moreover, the Secretary added a Preface explaining the purpose of the 2025 EPM. The Preface explains that the EPM "does not create rules that govern the conduct of members of the public not engaged in the work of conducting elections" unless it "expressly" so states. (*See id.* at 3.)

**B.      The EPM's description of statutory restrictions on electioneering**

Since 2019, the EPM has included a subsection titled "Enforcing Electioneering Ban." This subsection has remained essentially the same in the 2019, 2023, and 2025 versions. (*Compare* Ex. D (2019 EPM, Ch. 9, § III(A)) *and* Ex. E (2023 EPM, Ch. 9, §

III(A)) *with* Doc. 21-1 at 2 (2025 EPM, Ch. 9, § III(A)).)  The 2014 EPM, which governed elections between 2014 and 2020, contained the same language to which Plaintiffs object in the more recent EPMs, but formatted differently.  (*See* Ex. F (2014 EPM at  156-57).)

This subsection explains that Arizona statutes prohibit "electioneering" within 75 feet of a voting location.  (Doc. 21-2 at 202.)  That language explains that the statutory prohibition extends to electioneering that occurs when the speaker is standing outside the 75-foot limit, if the speaker is so loud that he or she is still "audible from a location inside the door to the voting location."  (*Id.*)

**III.    Two months after the Secretary issued the 2025 EPM, Plaintiffs asked the Secretary and Attorney General to "disavow" the EPM's descriptions of statutes.**

On February 12, 2026, Plaintiffs sent a letter to the Secretary and Attorney General asserting that the abovementioned subsections in the 2025 EPM "impose overly broad restrictions on protected speech" akin to the EPM provisions "enjoined by the District Court in 2024."  (Doc. 1-7 at 2.)  But Plaintiffs omitted the fact that the 2025 EPM does not include the provisions that gave this Court concern in 2024.  (*See generally id.*)  Plaintiffs also omitted the fact that the 2025 EPM includes a Preface explaining that the EPM "does not create rules that govern the conduct of members of the public" unless it "expressly" states.  (*See generally id.*)

Notably, the criticisms in Plaintiffs' letter aimed at parts of the EPM that have existed for years.  (*See id.* at 2-4.)  Yet Plaintiffs identified no situation where any election official had applied (or would apply) these parts in a manner inconsistent with any statute or constitutional provision.  (*See generally id.*)  Instead, Plaintiffs broadly asked the Secretary and Attorney General to "unequivocally and specifically disavow all enforcement" of so called "speech restrictions" in the 2025 EPM, as well as to "refuse to refer or assist in prosecuting any referral made pursuant to these restrictions."  (*Id.* at 2.)

On March 4, 2026, the Secretary and Attorney General sent a response letter to Plaintiffs, explaining several points.  First, the Secretary and Attorney General explained

that the 2025 EPM *describes* statutory restrictions on voter intimidation and electioneering; it does not expand the scope of unlawful conduct beyond what the statutes prohibit. (*See* Doc. 1-8 at 2-3, 5, 8-9.) In other words, neither the Secretary nor the Attorney General interprets the EPM's descriptions to be stricter than the statutes themselves. (*Id.* at 5, 8-9.) Second, the Secretary and Attorney General explained that the EPM's descriptions of statutes are accurate. (*Id.* at 3-5, 7-9.) Third, the Secretary and Attorney General explained that they are unaware of any election official who has interpreted the EPM's descriptions of statutes to be stricter than the statutes. (*Id.* at 5, 9.) Fourth, although the Secretary and Attorney General declined to "unequivocally disavow an intent to enforce the underlying statutes," they invited Plaintiffs to identify a specific situation that may be causing concern, if any exists. (*Id.*)

**IV.    Rather than identify a specific situation, Plaintiffs sued.**

In this action, Plaintiffs ask the Court to categorically prohibit the Defendants from "implementing and enforcing Chapter 9 §§ III.A & III.D of the EPM." (Mot. at 21.) Plaintiffs also ask the Court to require the Defendants to promulgate either "an updated EPM" or "a statewide policy of non-enforcement of the challenged provisions." (*Id.*) Despite the breadth of their requested injunction, Plaintiffs' Motion criticizes only certain statements in the challenged EPM subsections, namely that: (1) Arizona law prohibits electioneering "outside the 75-foot limit if it is audible from a location inside the door to the voting location," and that (2) certain conduct, "depending on context, may" fall within the statutory prohibitions against voter intimidation:

- "Impersonating a law enforcement officer or otherwise wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters,"
- "Using threatening language to a voter or poll worker,"
- "Directly confronting, questioning, photographing, or videotaping voters or poll workers in a harassing or intimidating manner, including when the voter or poll worker is coming to or leaving the polling location," and

7

- "Raising repeated frivolous challenges to poll workers without any good faith basis." (*See* Doc. 21-1 at 2, 4–5.)

## ARGUMENT

### I.      Plaintiffs have not made a clear showing of any element of standing.

This Court may only exercise jurisdiction where Plaintiffs have established "'the irreducible constitutional minimum of standing,' consisting of three elements: injury in fact, causation, and a likelihood that a favorable decision will redress [their] alleged injury." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

At the motion for preliminary injunction stage, Plaintiffs must make "a clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). Moreover, standing must be shown "for each claim" they seek to press and "for each form of relief" that is sought. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation omitted). Here, Plaintiffs have failed to make a "clear showing" of standing because they have not shown: (1) actual or imminent injury or (2) that the 2025 EPM would any such injury (which thus could be redressed by the injunction they seek).

### A.      Plaintiffs have not shown actual or imminent injury.

To establish injury-in fact, a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Here, Plaintiffs have not carried this burden because their alleged injuries are speculative, and they cannot establish organizational injury or representational standing.

#### 1.      Plaintiffs' fear of possible violations of their constitutional rights is speculative.

To the extent Plaintiffs claim that they will be injured because their constitutional rights to speak will be infringed, this claim is "conjectural or hypothetical," not "actual or imminent." *Lujan*, 504 U.S. at 560. As an initial matter, Plaintiffs do not claim they

8

have *already* been injured because of any enforcement of the 2025 EPM, nor by any enforcement of the functionally identical provisions of the 2023, 2019, or 2014 EPMs. Instead they are bringing a "pre-enforcement" claim, which is permitted only when "threatened enforcement" is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Plaintiffs have not met their burden because (1) they have not articulated "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that such conduct is "proscribed" by the law they are challenging, and (3) there is "a credible threat of prosecution" under the law. *Id.* (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). Plaintiffs fail each element and each failure requires denial of their Motion.

First, Plaintiffs have not articulated a specific intention to engage in constitutionally-protected conduct. Although Plaintiffs have provided two declarations in support of their Motion, neither declaration includes any specific plan by Plaintiffs to engage in constitutionally protected conduct. (*See generally* Doc. 13 ("Strabala Decl."); Doc. 14 ("Smith Decl.").) Instead, the Strabala Declaration generally states that law enforcement officers "frequently vote in uniform on their way to and from their shifts" (¶ 4). The Smith Declaration generally expresses concern that "repeated frivolous voter challenges to poll workers without any good faith basis" might be considered intimidating (¶ 28) and that the EPM provision regarding electioneering might ensnare someone for "speaking too loudly" (¶ 35), but it does not specify whether anyone affiliated with Plaintiffs intends to do either of these things. (Nor would frivolous voter challenges be constitutionally protected in any event.) In short, Plaintiffs do not express any concrete plan to engage in any of the conduct implicated by those EPM subsections. This failure obviates any plausible contention that they have standing to seek a preliminary injunction. *See Driehaus*, 573 U.S. at 159.

Second, Plaintiffs have not shown that the challenged provisions prohibit the conduct about which they express concern. Indeed, the types of constitutionally protected

conduct Plaintiffs identify are not proscribed by the challenged EPM subsections. The EPM subsections at issue do not proscribe conduct by members of the public. Rather, they *describe* statutory prohibitions. The 2025 EPM's Preface clarifies this point (*see* Doc. 21-2 at 3 (explaining that the EPM "does not create rules that govern the conduct of members of the public not engaged in the work of conducting elections" unless it "expressly" states)) and Defendants explained the same in the Secretary and Attorney General's letter (*see* Doc. 1-8 at 2-3, 5, 8-9.)

Further, the conduct Plaintiffs identified is not proscribed by either the EPM provisions or the statutes they describe. For example, Plaintiffs' concern about law enforcement officers and military personnel who show up to vote while in uniform being turned away (*e.g.*, Smith Decl. ¶ 14; Strabala Decl. ¶¶ 25-27) pertains to conduct not prohibited. (*See* Ex. G (Marra Decl. ¶¶ 26-28.) It is unclear how anything in the 2025 EPM or the underlying statutes would prevent uniformed officers from exercising their right to vote simply because they show up to vote in uniform.

Plaintiffs also express concern that a volunteer or election observer "may be subject to criminal penalty for innocuous behavior such as speaking too loudly." (*See* Strabala Decl. ¶ 35.) But neither the underlying electioneering statute, A.R.S. § 16-515(A), nor the relevant section of the EPM regulates observers merely speaking too loudly. (Marra Decl. ¶ 17-20.) Rather, the 2025 EPM clarifies that the statutory ban on electioneering within 75 feet of a voting location applies when someone is standing more than 75 feet away but is so loud that he or she "*is audible from a location inside the door to the voting location.*" (Doc. 21-1 at 2 (emphasis added).) An observer or volunteer who is merely speaking loudly, if over 75-feet away, would not likely be audible inside the door to a voting location. (Marra Decl. ¶ 18.) To the extent Plaintiffs are planning to engage in constitutionally protected conduct, none of it is proscribed by the 2025 EPM.

Third, Plaintiffs have not shown imminent injury because they have not shown a credible threat that the EPM provisions will be enforced in the way they fear. At best,

10

Plaintiffs' supporting declarations express concerns based on speculation that election officials or marshals "may" take certain action against party observers or members. (*See, e.g.*, Strabala Decl. ¶¶ 22, 25-27, 35; Smith Decl. ¶ 14.)

Notably, Plaintiffs are challenging EPM provisions that have been in place for years. (*See generally* Ex. D-F.) Yet they have identified no instance where any of these EPM provisions have been enforced in the manner they fear. This absence is not surprising because the Secretary, the Attorney General, and the State Election Director are unaware of any election official who has interpreted the EPM provisions in an unlawful or unconstitutional way. (Doc. 1-8 at 5, 8-9; Marra Decl. ¶¶ 12-14.) When the Secretary and Attorney General invited Plaintiffs to identify a specific situation that may cause concern, they failed to do so. Plaintiffs instead note an incident in North Carolina— not Arizona—where two uniformed officers were turned away from a voting location in error and the "issue was quickly resolved." (Smith Decl. ¶ 12.) Plaintiffs also reference guidance from New Mexico—not Arizona—which states that "[u]niformed police officers, and poll watchers wearing official-seeming clothing in polling places has been found to intimidate voters." (Smith Decl. ¶ 11.) But this selective quote from the New Mexico guidance appears to be no more than a statement of acknowledgement, as the very next sentence merely "recommends that counties balance" the "potentially intimidating effect of uniformed individuals" with "the need to preserve peace." (Doc. 13-2.)

Ultimately, Plaintiffs express general fears of arbitrary (and therefore unconstitutional) enforcement by unspecified non-parties to this action, but fail to establish any credible threat of such enforcement. But threatened injury cannot be merely speculative, it must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); s*ee also Babbitt*, 442 U.S. at 298 ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."). As Plaintiffs have not clearly shown a credible threat of

enforcement against them, their Motion must fail on standing grounds.

**2.      Plaintiffs fail to show standing based on organizational injury.**

To the extent Plaintiffs try to establish standing via organizational injury to the Pima County Republican Party ("PCRP"), they have failed to do so.  Where an organization "has not suffered a concrete injury caused by a defendant's action"—as is the case here—the "organization cannot manufacture its own standing" by voluntarily spending resources in response to a defendant's actions. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

Strabala's declaration confirms the absence of organizational injury.  First, it confirms that PCRP's expenditures are being made in the ordinary course of its operations.  (*See, e.g.*, Strabala Decl. ¶¶ 4-8 (explaining PRCP's work to promote voter participation, observe elections, enable voter challenges, and enable electioneering).)  But even before the decision in *Alliance for Hippocratic Medicine*, organizations did not have standing based on expenditures that were part of their ordinary activities.  *See, e.g.*, *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1155 (9th Cir. 2019) (holding that organization staff's time spent on a call with a parent about challenged policy did not establish standing because such calls were already part of staff's duties); *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459-60 (6th Cir. 2014) (stating that "it is not an injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already").

Second, although Strabala suggests that the challenged EPM subsections will cause PCRP to "incur additional compliance costs" (Strabala Decl. ¶ 37), the cause of any increase in costs is PCRP's own voluntary choice, not the EPM subsections.   The EPM provisions at issue are *guidance to election officials* regarding electioneering, voter intimidation, and interference laws, which do not regulate Plaintiffs.  (*See* Doc. 21-1 at 2–6; Doc. 21-2 at 3.)  The EPM subsections therefore *do not require PCRP* to take any action or spend money to modify trainings.  That PCRP elected to do so voluntarily cannot

support a showing of organizational injury under *Alliance for Hippocratic Medicine*. Indeed, a "self-inflicted injury, by definition, is not traceable to anyone but the plaintiff." *Buchholz v. Meyer Njus Tanock, PA*, 946 F.3d 855, 866 (6th Cir. 2020).

Third, to the extent PCRP is claiming it "needs" to spend more money on training because of the challenged EPM subsections, this claim is false. These subsections have been part of the EPM for years. (*See generally* Ex. D-F.) This history confirms that, to the extent PCRP will spend more money or do more training in 2026 than in prior election years, that choice is entirely voluntary, not caused by the 2025 EPM.

In sum, Plaintiffs' modifications of training or guidance based on speculative fears are insufficient to support a claim of organizational injury. *See Clapper*, 568 U.S. at 416 (a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

> **3.      To the extent Plaintiffs are relying on a theory of associational standing, that theory fails too.**

Any claim of associational injury also fails because Plaintiffs have not identified any PCRP member in their Complaint or declarations who suffered or will suffer injury as a result of the challenged 2025 EPM subsections. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497-99 (2009) (explaining that associational standing requires "plaintiff-organizations to make specific allegations establishing that *at least one identified member* had suffered or would suffer harm") (citation omitted) (emphasis added).

> **B.      Plaintiffs have not shown that their alleged injury is caused by the 2025 EPM, nor that their requested injunction would redress the injury.**

To have standing, Plaintiffs must show not only actual or imminent injury, but also that their injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. And "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."

*Steel Co v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1988). Here, even if Plaintiffs could show actual or imminent injury, they cannot establish causation or redressability to support Article III standing.

The root cause of Plaintiffs' purported concerns here are the statutes themselves, which Plaintiffs do not challenge—not the 2025 EPM. As Defendants have already explained to Plaintiffs, the 2025 EPM's description of statutory restrictions on voter intimidation and electioneering are "no stricter than the relevant statutory language." (Doc. 1-8 at 5, 9.)

Relatedly, because the statutes, not the EPM provisions describing them, would be the source of any injury to Plaintiffs, enjoining Defendants would not provide adequate relief to Plaintiffs. Enjoining Defendants from implementing and enforcing the challenged subsections and ordering the promulgation of a new EPM does nothing to curtail the underlying statutes. Law enforcement officers would retain independent authority to enforce those statutes against violators.

Moreover, if a circumstance arises where an election marshal or official interprets the challenged EPM subsections *stricter* than the applicable statutes and calls local law enforcement based on such interpretation, that conduct would not be fairly traceable to Defendants. Rather, such conduct would be a result of the independent action of a third party not before the court and therefore cannot support standing in this case under *Lujan*. *See Fulani v. Brady*, 935 F.2d 1324, 1329 (D.C. Cir. 1991) (explaining that injury is not fairly traceable to defendant's conduct when injury depends on independent intervening or additional causal factors). Likewise, as explained above, any self-imposed costs undertaken by PCRP are untraceable to Defendants under *Alliance for Hippocratic Medicine*. Accordingly, Plaintiffs cannot make a clear showing of causation or redressability here.

**II.    Plaintiffs are not entitled to the injunction they seek.**

Even if Plaintiffs could make the required clear showing of standing, a "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). A "plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id*. at 20. Plaintiffs have not established any of these factors and the Court should deny their request for injunctive relief.

### A.    Plaintiffs are not likely to succeed on the merits because the state's interest in protecting voters' rights and preventing fraud outweigh any incidental burden on political speech.

#### 1.    Limiting voter intimidation and electioneering inside and near voting locations does not violate the First Amendment.

The Supreme Court has grappled with "the accommodation of the right to engage in political discourse with the right to vote—a right at the heart of our democracy." *Burson*, 504 U.S. at 198. A plurality of the Court believed that the electioneering ban at issue in that case involved a content-based restriction on political speech in a traditional public forum—the type of law that deserves the most exacting level of review. *Id.* Accordingly, the Court required the state to "show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Id.* (quoting *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983)).[5]

Even subjected to the highest level of constitutional scrutiny, Tennessee's

---

[5] Justice Scalia concurred in the judgment, but wrote separately to explain his view: "Because restrictions on speech around polling places on election day are as venerable a part of the American tradition as the secret ballot, [Tennessee's 100-foot electioneering free zone] does not restrict speech in a traditional public forum, and the 'exacting scrutiny' that the plurality purports to apply . . . is inappropriate. Instead, [the challenged law], though content-based, is constitutional because it is a reasonable, viewpoint-neutral regulation of a nonpublic forum." *Burson*, 504 U.S. at 214 (Scalia, J., concurring).

15

electioneering ban, extending 100 feet from the entrance to the polling place, survived. The Court recognized "that the State . . . has asserted that the exercise of free speech rights conflicts with another fundamental right, the right to cast a ballot in an election free from the taint of intimidation and fraud." *Id.* at 210. And it concluded that "[a] long history, a substantial consensus, and simple common sense show that some restricted zone around polling places is necessary to protect that fundamental right." *Id.* Arizona's smaller electioneering-free zone and its prohibition on voter intimidation serve precisely the same compelling interests, and the EPM provisions that describe Arizona's laws for election officials similarly pass constitutional muster. (*See* Marra Decl. ¶¶ 19-20, 23, 41-42.)

Twenty years after *Burson*, the full Court came to view polling places and their environs as Justice Scalia had in *Burson*—as nonpublic fora where even content-based speech restrictions are permissible if they are "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *See Minn. Voters Alliance*, 585 U.S. at 2. Here, Arizona's electioneering-free zone and prohibitions on voter intimidation are viewpoint-neutral reasonable efforts to protect voters' right to peacefully deliberate and vote for the candidates of their choice. Consequently, Defendants' interest in protecting voters' rights outweighs any alleged infringement on Plaintiffs' First Amendment rights.

> **2.    The challenged subsections do not proscribe conduct that state and federal statutes allow.**

There is no question that Arizona's electioneering and voter intimidation statutes are constitutional, and Plaintiffs have not challenged those statutes. Instead, they seek an injunction against the descriptions and examples in the EPM that help guide the election officials whose job is to "preserve order at the polls and permit no violation of the election laws." A.R.S. § 16-535(B). But those descriptions and examples do not prohibit conduct that the statutes otherwise allow. As such, they do not unconstitutionally restrict Plaintiffs' conduct.

The laws that Plaintiffs do *not* challenge speak in broad terms. For example, A.R.S. § 16-1013(A)(1) prohibits a person "in any manner to practice intimidation upon or against any person, in order to induce or compel such person to vote or refrain from voting for a particular person or measure at any election provided by law, or on account of such person having voted or refrained from voting at an election." *See also, e.g.,* 18 U.S.C. § 594. Similarly, A.R.S. § 16-1017(A)(2) makes it a class 2 misdemeanor to "[i]nterfere[] with a voter within the seventy-five foot limit of the polling place [or] the main outside entrance to an on-site early voting location. And A.R.S. § 16-1017(A)(3) also makes it a class 2 misdemeanor to "[e]ndeavor[] while within the seventy-five foot limit for a polling place or on-site early voting location to induce a voter to vote for or against a particular candidate or issue." A.R.S. § 16-515 also prohibits electioneering and photography within the 75-foot limit and also designates violations of those prohibitions class 2 misdemeanors. A.R.S. § 16-515(A), (G), (H).

To assist election officials with implementing these broad prohibitions, the EPM gives a few examples of conduct that might be considered intimidating. (*See* Doc. 21-2 at 204 (providing "examples of actions that, depending on context, may be considered intimidating conduct inside or near the polling place while voting is occurring").) Plaintiffs complain that the EPM examples "lack standards" and therefore "invite[] arbitrary enforcement." (Mot. at 12.) But Plaintiffs provide no evidence of such arbitrary enforcement occurring in the six (or more) years that the challenged EPM provisions have been in place. And Plaintiffs' solution to this illusory problem is to remove the guidance altogether, but that would still leave in place the underlying statutes, which are no more specific than the EPM. It defies logic that enjoining the challenged EPM provisions, leaving the unchallenged broader statutory provisions in place, would provide the clearer standards that Plaintiffs seek to avoid arbitrary enforcement.

In particular, Plaintiffs argue that the provision describing as potentially intimidating "[r]aising repeated frivolous voter challenges to poll workers without any

17

good faith basis" is unconstitutional because it does not define "repeated" or "frivolous." (Mot. at 12.) The voter challenges to which this provision refers are statutory challenges governed by A.R.S. §§ 16-590 to -594, which provide specific statutory bases on which a challenger may challenge a voter and set forth the procedures for such challenges. (*See* Marra Decl. at ¶¶ 31-37.) "[R]epeated" and "frivolous" need only their common dictionary definitions.

Plaintiffs also complain that "[t]he EPM prohibits 'wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters,' but offers no guidance on what clothing would be likely to do that or how an official could make that determination in an objective manner." (Mot. at 12-13.) But Plaintiffs ignore part of the challenged provision. The full example in the EPM states that it might intimidate voters to "[i]mpersonat[e] a law enforcement officer or otherwise wear[] clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters (*see also* A.R.S. § 26-170, prohibiting unauthorized wearing of national guard or U.S. armed forces uniform)." (Doc. 21-2 at 204.) Moreover, elsewhere the EPM makes clear that "voters or voters' assistants are permitted to wear clothing with political messages, [but] election board members, other election officials, or political party observers may not wear, carry, or display any materials that identify or express support or opposition for a political party, political organization, or a candidate or ballot measure appearing on the ballot." (*Id.* at 202.) Reading these related provisions together, it is clear that potentially intimidating apparel is clothing that *approximates* that worn by members of the military or law enforcement to imply that the wearer has legal authority that he or she does not actually have. (*See* Marra Decl. ¶¶ 21-23, 26-30.)

Plaintiffs also argue that the example regarding "aggressive behavior" fails to provide adequate notice of what conduct is prohibited. Again, Plaintiffs fail to cite the entire provision, which states that voter intimidation might take the form of "[a]ggressive behavior, such as yelling at or taunting a voter or poll worker." Plaintiffs do not argue

that the Constitution allows them to yell at or taunt voters or poll workers.  Nor would any such argument be supported.  The State may take steps to prevent such interference with voters in the vicinity of a polling place.  *See Burson*, 504 U.S. at 210.

Finally, Plaintiffs challenge the EPM provision that explains that electioneering is permitted outside the 75-foot limit unless that speaker's exhortations to vote for or against a particular candidate or issue can be heard inside the voting location.  (Mot. at 4-6.)  This is not an expansion of the ban on electioneering beyond the statute.  Rather, it is an explanation that amplifying one's electioneering message so that it is heard inside the voting location, even if the speaker is at least 76 feet away from the speaker, unlawfully interferes with voters, election officials, and the observers who are engaged in carrying out their election-related duties inside the voting location.  (*See* Marra Decl. at ¶¶ 15-20.)

Because none of the challenged EPM subsections go beyond the statutes that they help implement, and those statutes' limited restrictions on speech are constitutional, Plaintiffs do not have a likelihood of success on the merits of their claims.

**B.    Plaintiffs do not face irreparable harm from the EPM provisions they challenge.**

Plaintiffs' assertion that they will suffer irreparable harm absent injunction rests entirely on their argument that the EPM subsections they challenge deprive them of their First Amendment rights.  (Mot. at 20.)  And while "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 472 U.S. 347, 373 (1976), the challenged EPM provisions do not unconstitutionally restrict those rights as explained above.  Plaintiffs' lack of injury is particularly apparent because the provisions that they challenge have been in the EPM for years, yet they have not identified any way in which their engaging in political speech has been curtailed over that time.  Accordingly, they have not established the irreparable harm necessary to support injunctive relief.

## C.    The remaining injunction factors favor Defendants.

"The third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry when the government opposes a preliminary injunction." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).  The balance of equities compares the burdens or hardships to Plaintiffs with the burden on Defendants if the Court enjoins the challenged EPM provisions.  *Id.*  The public interest factor looks to how the proposed injunction would impact nonparties.  *Id.*

As explained in the standing section above, Plaintiffs are not burdened by the EPM subsections they challenge.  Defendants, however will be harmed by an injunction.  In particular, the Secretary, with the Attorney General's approval, is required to make rules "to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and voting . . . ."  A.R.S. § 16-452.  Enjoining the guidance in the challenged EPM subsections threatens uniformity of implementation from county to county.

More importantly, the public interest, including the interests of Arizona's county election officials and voters, will be harmed by the injunction Plaintiffs seek.  Poll worker training materials have already been designed and produced and training has begun.  (Marra Decl. ¶¶ 6-8.)  Enjoining guidance that helps explain how to protect voters from interference and intimidation risks creating confusion at this late hour.  *See Purcell v. Gonzalez*, 540 U.S. 1, 4-5 (2006) ("Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.").

Moreover, the fact that this Court has little time for considered reflection is a situation of Plaintiffs' own making.  The provisions they challenge have been in the EPM for years.  In addition, Plaintiffs knew no later than March 4, 2026 that the Defendants would not accede to their demands to change the 2025 EPM (which itself was issued on

20

December 22, 2025), but they waited more than two months to file the Motion. *See Ariz. Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 924 (D. Ariz. 2016) (holding that the equitable defense of laches barred preliminary injunctive relief because plaintiff's delay left the court and defendants with only eighteen days to brief the issue and the court to decide). This unexplained and unwarranted delay prejudices the Defendants, Arizona voters, and the administration of justice. *Id.* at 922-924. Accordingly, the last two injunction factors weigh heavily in favor of Defendants.

### III.    Plaintiffs' requested injunction is overbroad and should be tailored to specific EPM provisions and specific situations.

Should the Court disagree and determine that Plaintiffs' claims merit injunctive relief, a preliminary injunction must be "narrowly tailored to remedy the specific harm alleged." *United States v. BNS Inc.*, 858 F.2d 456, 464 (9th Cir. 1988). But Plaintiffs instead demand the wholesale suspension of several subsections of the EPM, devoid of context or limitation. (*See generally* Mot.). Plaintiffs' requested relief is far too broad to be practicable and does not comport with the governing legal standards.

The Court should at least narrow Plaintiffs' broad request for injunctive relief. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (discussing district court's obligation to narrow injunctive relief to proscribe only unconstitutional conduct). This Court retains "considerable discretion in fashioning the terms of an injunction" but must exercise that discretion to tailor relief "to eliminate only the specific harm alleged. An overbroad injunction is an abuse of discretion." *E.J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992) (citing *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 973 (9th Cir.1991)); *see also Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990) ("There are limitations on this discretion; an injunction must be narrowly tailored to give only the relief to which plaintiffs are entitled.").

Therefore, even if an injunction were warranted, rather than enjoining entire subsections of the EPM, any injunction should be tailored to and limited by what Plaintiffs

Case 2:26-cv-03108-MTL   Document 23   Filed 06/05/26   Page 23 of 24

themselves have specified.  This Court should solely address the specific phrases within the EPM identified by Plaintiffs and enjoin only specific actions by Defendants that Plaintiffs allege may harm them.  Such an injunction would at least be narrowed to the alleged harms and the parties before this Court.

## CONCLUSION

Plaintiffs have not made the required clear showing of standing, nor have they established any of the four injunction factors.  This Court should deny the Motion.

RESPECTFULLY SUBMITTED this 5th day of June, 2026.

Kristin K. Mayes
Attorney General


By:  /s/  *Karen J. Hartman-Tellez*
Karen J. Hartman-Tellez
Kara Karlson
Kyle Cummings
*Attorneys for Arizona Secretary of State*
*Adrian Fontes*

Joshua M. Whitaker
Syreeta A. Tyrell
Jaylia Yan
*Attorneys for Arizona Attorney General*
*Kristin K. Mayes*

22

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 5th day of June, 2026, I filed the forgoing document electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing

*/s/ Karen J. Hartman-Tellez*

23