# EXHIBIT G

KRISTIN K. MAYES
Attorney General
(Firm State Bar No. 14000)
Office of the Arizona Attorney General
2005 North Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333

Karen J. Hartman-Tellez (021121)
Kara Karlson (029407)
Kyle Cummings (032228)
Karen.Hartman@azag.gov
Kara.Karlson@azag.gov
Kyle.Cummings@azag.gov
Adminlaw@azag.gov
*Attorneys for Defendant Adrian Fontes*

Joshua M. Whitaker (032724)
Syreeta A. Tyrell (034273)
Jaylia Yan (041148)
Joshua.Whitaker@azag.gov
Syreeta.Tyrell@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov
*Attorneys for Defendant Kristin K. Mayes*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Kathleen Winn, *et al.*, | No. CV-26-03108-PHX-MTL |
| Plaintiffs, | |
| v. | **DECLARATION OF LISA MARRA** |
| Adrian Fontes, *et al.* | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, Lisa Marra, declare as follows:

1.    I am a resident of Arizona. I am over the age of 18 and have knowledge of all the facts stated herein, either personally or in consultation with staff at the Office of the Arizona Secretary of State and/or based on documents that I have reviewed.  If called as a witness, I could and would testify competently to the matters stated herein.

2.    I am employed by the Arizona Secretary of State as the State Election Director, a position I have held since March 2024. I began my employment at the Secretary of State's Office in March 2023 as Deputy State Election State Director. In my role as State Election Director, I communicate regularly with Arizona's 15 county election directors about their duties.

3.    Before joining the Secretary's Office, I was employed by Cochise County for 11 years, including serving as the County's Election Director from 2017 to 2022. In that capacity, I supervised a full-time staff of two and was responsible for the hiring, training, and supervision of approximately 200 poll workers for each Presidential Preference, Primary, and General Election and a smaller number of poll workers for jurisdictional elections.  In total, I was responsible for all election day activities for seven federal elections and nine jurisdictional elections, including securing vote center locations, hiring and training poll workers, and programming, testing, and tabulating ballots for more than 80,000 active voters in Cochise County.

4.    I am a Certified Public Manager and a Certified Election/Registration Administrator.  The latter certification is conferred after completion of extensive continuing professional education in voter registration and elections administration offered as a joint project of the Election Center of the National Association of Election Officials and Auburn University.  I also served on the Secretary of State's Curriculum Committee and have taught numerous certification classes for Election Officials.  During my time as Cochise County Election Director, I was elected by my peers for three terms as President of the Election Officials of Arizona, which represents all 15 county election directors. I have also served as a member of the U.S. Elections Assistance Commission

1

Local Leadership Council. . I currently serve as the Secretary on the executive board for the Advisory Board of the U.S. Elections Assistance Commission.

5. Through participation in the Election Officials of Arizona and as State Election Director, I am familiar with poll worker hiring and training practices of all of Arizona's counties.

6. Pursuant to A.R.S. § 16-532(A), counties begin training poll workers 45 days before each election and complete most poll worker training around the time that early voting begins, 27 days before election day. Poll workers must complete the training and be certified before working at a voting location.

7. Materials to be used in poll worker training are developed and printed before training begins. Poll workers are advised to bring their handbooks and notes taken during training with them to the polling places where they are working.

8. In my experience, for each election, approximately 70 percent of the poll workers have already worked in previous elections. As such, the majority of poll workers have received poll worker training on multiple occasions.

9. I am aware of the *Winn v. Fontes* lawsuit (Case No. CV-26-03108-PHX-MTL) and Plaintiffs' challenges to the 2025 EPM. I was responsible for overseeing the creation of the 2025 EPM on behalf of the Secretary, and I submit this Declaration to provide information concerning the EPM relevant to this lawsuit.

**General nature of the EPM**

10. One of the purposes of the EPM is to explain statutes to the town, city, and county election officials who carry out the day-to-day work of elections. *See* 2025 EPM, Preface.

11. Chapter 9, §§ III.A and III.D of the 2025 EPM explain certain statutes to election officials, including the Arizona statute barring electioneering within 75 feet of a voting location and the federal and state statutes prohibiting voter intimidation.

2

12.    In my experience, election officials do not interpret these EPM subsections as going beyond the statutes to impose any additional restrictions on members of the public, voters, or election observers.

13.    I am not aware of any election official who interprets § III.A to be stricter than the statute that establishes the 75-foot electioneering limitation, A.R.S. § 16-515.

14.    I am not aware of any election official who interprets § III.D to be stricter than the statutes prohibiting voter intimidation.

**EPM subsection about electioneering statute**

15.    One of the paragraphs in EPM Chapter 9, § III.A, says:

> No electioneering may take place within the 75-foot limit of a voting location. A.R.S. § 16-515(A). Additionally, no electioneering may take place outside the 75-foot limit if it is audible from a location inside the door to the voting location. The 75-foot limit is measured from the main outside entrance of the voting location.

16.    The purpose of this paragraph is to explain the statute that prohibits electioneering within 75 feet of a voting location.

17.    The second sentence of this paragraph refers to unusual situations where someone stands more than 75 feet away from the voting location, but amplifies their voice or is otherwise so loud that their message can still be heard inside the door to the voting location.

18.    I do not know of any actual situation where someone stood more than 75 feet away from a voting location but was so loud that their message could be heard inside the door to the voting location.  Seventy-five feet is a significant distance away, so someone would need to significantly amplify their voice to be heard inside, such as by using a megaphone.

19.    Although I do not know of any situation where this happened, if someone actually did stand more than 75 feet away and engaged in electioneering so loudly that people inside the door to the voting location could hear their message, I think this would

be a violation of the statute itself, and it would be appropriate for an official to ask the person to speak more quietly or to leave.

20.    Moreover, electioneering activity that is so loud that it is audible inside the polling location would interfere with election officials' communications with each other and voters, including providing instructions on how to check in and receive their ballots, complete their ballots, and deposit them in the ballot boxes.  In addition, it would interfere with voters' ability to mark their ballots without receiving electioneering messages during that process.

21.    Another paragraph in § III.A says:

> Though voters or voters' assistants are permitted to wear clothing with political messages, election board members, other election officials, or political party observers may not wear, carry, or display any materials that identify or express support or opposition for a political party, political organization, or a candidate or ballot measure appearing on the ballot. A.R.S. § 16-515(F).

22.    The purpose of this paragraph is to explain the statute pertaining to certain people who are acting in an official capacity, namely election officials and political party observers and challengers (not voters), who wear or display materials that support or oppose a political party, candidate, or ballot measure within 75 feet of a voting location.

23.    In my experience, it is important to ensure that people who are acting in an official capacity do not wear or display materials that support or oppose a specific political party, candidate, or ballot measure near a voting location.  This helps ensure that voters have confidence in the election because otherwise voters might suspect that the election is being run or improperly influenced by biased officials.  This also helps ensure that voters are not improperly influenced at the voting location when making their own voting decisions.

4

**EPM subsection about voter intimidation statutes**

24.    EPM Chapter 9, § III.D lists "examples of actions that, depending on context, may be considered intimidating conduct inside or near the polling place while voting is occurring."

25.    The purpose of this list is to identify examples of conduct that may violate the statutes prohibiting voter intimidation, depending on the circumstances. The list is helpful because the statutes are written in general language, so a list of examples helps illustrate things to look out for. If a voter does something on this list, that doesn't necessarily mean they are violating the statutes. The appropriate response will depend on the circumstances.

26.    One of the examples on this list in the EPM is:

"Impersonating a law enforcement officer or otherwise wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters (see also A.R.S. § 26-170, prohibiting unauthorized wearing of national guard or U.S. armed forces uniform)"

27.    This example does not refer to situations where a law enforcement officer or military service member shows up to vote in uniform.

28.    In my experience, law enforcement officers and military service members regularly vote, and sometimes they wear their uniform to vote at a voting location. Indeed, during my time in Cochise County, police officers, sheriff's deputies, and service members stationed at Fort Huachuca often voted in uniform at Cochise County polling places. I do not know of any situation in Arizona where any such voter has been turned away or otherwise treated negatively because of their uniform.

29.    I also do not know of any government official who interprets this example in the EPM as suggesting that a law enforcement officer or military service members who shows up to vote in uniform should be turned away or otherwise treated negatively.

30.    This example in the EPM refers to situations where someone "impersonates" a law enforcement officer or wears a uniform that, under the

5

circumstances, is "intended to deter, intimidate, or harass" voters. For example, if a group of people come to a voting location wearing tactical gear and carrying weapons, it would be appropriate for an official to find out whether they are law enforcement officers or military service members carrying out their duties, and if they are not, to ask them to set aside their tactical gear and assault rifles before entering the voting location. Moreover, federal law strictly limits the presence of the military at polling places, but also provides that states "shall not prevent any officer or member of the armed forces of the United States from exercising the right of suffrage in any election district to which he may belong, if otherwise qualified according to the laws of the State in which he offers to vote." 18 U.S.C. § 592.

31. Another example on the list in the EPM is:

"Raising repeated frivolous voter challenges to poll workers without any good faith basis, or raising voter challenges based on race, ethnicity, national origin, language, religion, or disability."

32. This example relates specifically to challenges to voters governed by A.R.S. §§ 16-590 through -594.

33. This example does not refer to situations where someone challenges a voter's qualifications in good faith.

34. This example also does not refer to situations where someone raises a frivolous challenge to a voter's qualifications in bad faith, but only does so once.

35. Instead this example refers to a situation where someone raises a frivolous challenge to a voter's qualifications in bad faith, multiple times.

36. In my experience, political party challengers generally act in good faith when they raise challenges to a voter's qualifications.

37. Nonetheless, if a political party challenger were to raise a frivolous challenge to a voter's qualifications in bad faith *multiple times*, it would be appropriate for an official to ask the challenger to stop raising that challenge.

38. Other examples on the list in the EPM include:

6

"Using threatening language to a voter or poll worker;" and

"Directly confronting, questioning, photographing, or videotaping voters or poll workers in a harassing or intimidating manner, including when the voter or poll worker is coming to or leaving the polling location;"

39. These examples refer to situations where someone is using "threatening language" or engaging in "harassing or intimidating" conduct.

40. In my experience, the vast majority of people at voting locations do not use threatening language or engage in harassing or intimidating conduct.

41. Arizona law requires that one of the election officials working at each polling place be the election marshal. A.R.S. § 16-535(A). The law requires that the election marshal "preserve order at the polls and permit no violation of the election laws from the opening of the polls until the count of the ballots is completed." A.R.S. § 16-535(B).

42. Consistent with this statutory obligation, if someone at a voting location were to use threatening language to a voter or poll worker or engage in harassing or intimidating conduct directed at a voter or poll worker, then depending on the circumstances, it may be appropriate for the election marshal to ask the person to either stop or leave, or in egregious circumstances to contact law enforcement to assist with preserving order at the voting location.

**My duty to oversee logic and accuracy testing**

43. One of my duties as State Election Director is to conduct the Secretary's logic and accuracy ("L&A") testing of voting equipment pursuant to A.R.S. § 16-449. L&A testing of accessible voting devices and optical scan voting location and central count tabulation equipment must occur between 34 and 27 days before an election, *i.e.,* in the week before early voting commences. 2025 EPM, at 102-03.

44. For the July 21, 2026 Primary Election, I and other Secretary of State's Office staff will be required to travel to each of Arizona's 15 counties to conduct the

7

Secretary's L&A testing from June 15 through June 22, 2026.  Accordingly, I will not be able to be in Phoenix on June 16, 2026.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on the 5th of June, 2026, at Phoenix, Arizona.

_____
Lisa M. Marra

8