**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Kathleen Winn, et al.,

Plaintiffs,

v.

Adrian Fontes, et al.,

Defendants.

No. CV-26-03108-PHX-MTL

**ORDER**

Plaintiffs Kathleen Winn and the Pima County Republican Party bring a facial challenge to four provisions of Arizona's 2025 Elections Procedures Manual ("EPM") that regulate speech and conduct in and around polling places, contending the provisions exceed constitutional limits. They move to preliminarily enjoin the provisions' enforcement. (Doc. 12.)

That Motion, brought against Defendants Secretary of State Adrian Fontes and Attorney General Kris Mayes, is fully briefed. (Docs. 23, 28.) The Court also held an evidentiary hearing over two days. Having considered the briefing and the evidence introduced at those hearings, the Court will grant the Motion in part and deny it in part.

Two related motions, Plaintiffs' Motion to Recognize Admission (Doc. 40) and Motion for Leave to Serve an Expedited Subpoena (Doc. 48), are also addressed in this Order.

## I.    BACKGROUND

Arizona law directs the Secretary of State to prescribe rules that "achieve and

maintain the maximum degree of correctness, impartiality, uniformity and efficiency" in voting procedures, published in an EPM issued every odd-numbered year and approved by the Governor and Attorney General. A.R.S. § 16-452(A)-(B). "Once adopted, the EPM has the force of law; any violation of an EPM rule is punishable as a class two misdemeanor." *Ariz. Pub. Integrity All. v. Fontes*, 250 Ariz. 58, 63 (2020) (citing A.R.S. § 16-452(C)).

At issue are four provisions of the 2025 EPM, all in Chapter 9, Section III. The first, in Section III.A, restricts certain forms of electioneering near polling locations. Plaintiffs call it the "Electioneering Ban." It provides:

> No electioneering may take place within the 75-foot limit of a voting location. A.R.S. § 16-515(A). Additionally, no electioneering may take place outside the 75-foot limit if it is audible from a location inside the door to the voting location.

(Doc. 21-1 at 2.)

The remaining three appear in Section III.D, which is aimed at "preventing voter intimidation" and lists "actions that, depending on the context, may be considered intimidating conduct inside or near the polling place while voting is occurring." (Doc. 21-1 at 3-5.) Plaintiffs call these the "Political Speech Restrictions." The three they challenge provide:

- Aggressive behavior, such as yelling at or taunting a voter or poll worker;
  . . . .
- Impersonating a law enforcement officer or otherwise wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters (*see also* A.R.S. § 26-170, prohibiting unauthorized wearing of national guard or U.S. armed forces uniform);
  . . . .
- Raising repeated frivolous voter challenges to poll workers without any good faith basis, or raising voter challenges based on race, ethnicity, national origin, language, religion, or disability.

(*Id.*)

This is not the Court's first encounter with the EPM's voter-intimidation provisions. In *American Encore v. Fontes*, 152 F.4th 1097, 1105 (9th Cir. 2025), the Ninth Circuit reviewed a challenge to the 2023 EPM's "Preventing Voter Intimidation" subsection,

which that court called the "Speech Provision." The 2023 subsection was broader than the provisions at issue here. It opened with a sweeping sentence prohibiting "[a]ny activity by a person with the intent or effect of threatening, harassing, intimidating, or coercing voters." *Am. Encore*, 152 F.4th at 1105. This Court enjoined that provision and the Ninth Circuit affirmed, holding that it arguably expanded the underlying intimidation statute, A.R.S. § 16-1013, by broadening the required mental state from "knowingly" to mere "effect" and by dropping the statutory "induce or compel" element. *Id.* at 1116-17.

In the 2025 EPM, the Secretary deleted that opening sentence and removed "raising one's voice" and "insulting" or "offensive" language as examples. The Secretary also added a Preface stating that the EPM "does not create rules that govern the conduct of members of the public not engaged in the work of conducting elections" unless it expressly so states. (Doc. 21-2 at 3.) The Secretary retained the apparel example, which had been part of the enjoined 2023 subsection. (Doc. 28 at 6, 10-11; *compare* Doc. 23-5 *with* Doc. 21-2.)

After the 2025 EPM issued on December 22, 2025, Plaintiffs demanded that the Secretary and Attorney General disavow enforcement of the electioneering ban and political speech restrictions. (Docs. 1 ¶ 47; 1-7.) The officials declined to "unequivocally disavow" enforcement of the underlying statutes supporting those provisions of the EPM. They represented that the EPM merely describes those statutes, that they do not read it more strictly than the statutes, and that they are unaware of any election official who does. (Doc. 1-8.)

Plaintiffs sued and moved for a preliminary injunction. (Docs. 1, 12.) Their evidentiary submission consists of declarations from Joel Strabala, the Republican Party legislative district 17 chair, and Dave Smith, a retired Arizona Department of Public Safety lieutenant, both on behalf of the Party, and a declaration from counsel attaching the Secretary's budget request. (Docs. 13-14, 26.) In reply, Plaintiffs added declarations from Officer Jamie Voss and a second declaration from Strabala. (Docs. 31-32.) Defendants submitted the declaration of State Election Director Lisa Marra. (Doc. 23-7.)

- 3 -

Direct testimony from the witnesses was entered through the witnesses' respective declarations. Defendants cross-examined Strabala, Smith, and Voss. Plaintiffs cross-examined Marra.

Between hearing days, Defendants sent Plaintiffs a follow-up letter and then filed it with the Court. (Doc. 39.) In it, the Attorney General and Secretary represent that the apparel provision does not mean a law enforcement officer or military member who shows up to vote in uniform should be turned away for being in uniform. (Doc. 39-1.) Plaintiffs then filed a Motion to Recognize Admission, asking the Court to treat the letter "as an important admission," or, in the alternative, that the letter be admitted into evidence because it "disavow[s] the plain meaning-interpretation" of the Political Speech Restrictions. (Doc. 40.) Several days later, Plaintiffs moved for leave to serve an expedited subpoena on the Tucson Police Department, seeking documents about a recent policy on officers voting while armed. (Doc. 48.)

The Court now rules on the pending motions.

## II.    STANDING

The Court first assesses whether it has jurisdiction to consider Plaintiffs' claims. Defendants argue that Plaintiffs lack standing to challenge the four EPM provisions at issue. (Docs. 29 at 4-6; 23 at 9-15.)

Article III of the Constitution requires a plaintiff to demonstrate "the core component of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must show injury in fact, causation, and redressability. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. At the preliminary injunction stage, Plaintiffs must make a "clear showing" of standing for each claim and each form of relief. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *see also L.A. All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956-57 (9th Cir. 2021) ("At the preliminary injunction stage, the plaintiffs must make a clear showing of each element of standing, . . . relying on the allegations in

their complaint and whatever other evidence they submitted in support of their [preliminary-injunction] motion to meet their burden." (citation modified)). Pre-enforcement First Amendment challenges, such as this case, "tilt dramatically toward a finding of standing." *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) (citation modified).

The named Plaintiffs are Kathleen Winn and the Pima County Republican Party. An organization may assert standing either on behalf of its members, referred to as associational standing, or directly on its own behalf, referred to as organizational standing. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021). Plaintiffs invoke both. (Doc. 28 at 5-8.)

### A.   Injury in Fact

#### 1.   Associational Standing

An organization has associational standing when (1) at least one of its members would have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Party need not name an injured member, so long as it is "clear and not speculative" that an identified member is adversely affected. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025).

Two of the three *Hunt* requirements are satisfied and do not vary by provision. As to germaneness, the political participation of the Party's members, observers, and voters is plainly germane to the Party's purpose of electing its candidates. (*See* Doc. 28 at 7.) As to the third requirement, Plaintiffs seek only declaratory and injunctive relief, which does not require the participation of individual members. *See Hunt*, 432 U.S. at 343.

Defendants' principal associational-standing argument is that Plaintiffs have not identified a member who has suffered or will suffer an injury. (Doc. 23 at 13.) To show injury-in-fact in this pre-enforcement posture, a plaintiff must establish three points: (1) an intent to engage in a course of conduct arguably affected with a constitutional interest,

(2) that the conduct is arguably proscribed by the challenged rule, and (3) a credible threat of enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). The answer to that inquiry differs across the four provisions, because each reaches different conduct. The Court takes them in two groups.

### 2. Electioneering and Apparel Provisions

The electioneering provision states that "no electioneering may take place outside the 75-foot limit if it is audible from a location inside the door to the voting location." (Doc. 21-1 at 2.) The apparel provision lists, as conduct that "depending on context, may be considered intimidating," "wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters." (*Id.* at 4-5.)

The parties first dispute whether Plaintiffs have demonstrated an intent to engage in conduct arguably affected by a constitutional interest. To make that showing, a pre-enforcement plaintiff must show an intention to engage in a course of conduct arguably proscribed by the challenged rule. *Driehaus*, 573 U.S. at 159. Courts look to "declarations submitted by Plaintiffs [that] discuss past expressive conduct[,]" and "declarations specifying the types of speech and conduct they regularly engage in." *Am. Encore*, 152 F.4th at 1115.

Winn is the Pima County Republican Party's chair and a registered Arizona voter who intends to conduct election activity during the 2026 election. (Doc. 1 ¶¶ 14-20.) The Party likewise trains its members to conduct electioneering outside the 75-foot limit, and states it and its members will continue to do so in 2026. (Doc. 14 ¶¶ 5-6, 11, 14.) Officer Jamie Voss, a Tucson police officer, registered voter, and member of the Party, testified that he voted in person in professional police attire in 2024 and that he "intend[s] to vote in person either in uniform or in professional police attire with [his] equipment again" in 2026. (Doc. 32 ¶ 7.) Having shown regular engagement in the expressive conduct the provisions arguably proscribe, Plaintiffs have demonstrated the requisite intent as to the electioneering and apparel provisions.

Plaintiffs must also show that their intended conduct is arguably proscribed by the

challenged rule. *Driehaus*, 573 U.S. at 159. In assessing this factor, courts examine whether a provision "adds new criminal prohibitions as opposed to summarizing the existing voter-intimidation statutes—based on the substantial variance between" a provision's purported summary and the actual text of the statute. *Am. Encore*, 152 F.4th at 1116-17. The Court accepts Plaintiffs' construction of the provisions, so long as it is reasonable. *Id.* at 1110-11.

Both provisions arguably add prohibitions extending beyond a mere summary of the statutes. The electioneering statute provides that "no electioneering may occur within the seventy-five foot limit." A.R.S. § 16-515(A). The EPM, by contrast, bars electioneering "outside the 75-foot limit if it is audible from a location inside the door." (Doc. 21-1 at 2.) The statute does not prohibit conduct outside the 75-foot limit, while the electioneering provision arguably does, so the Court finds that the electioneering provision adds a new dimension beyond the statutory language. So does the apparel provision. It cites A.R.S. § 26-170, which prohibits wearing a military uniform unless one is a member of the service whose uniform is worn, yet it proscribes apparel "intended to deter, intimidate, or harass voters," conduct that statute does not address. (Doc. 21-1 at 4-5.) Plaintiffs' intended conduct, electioneering and wearing professional police attire while voting, arguably falls within the provisions' purported prohibition.

The Court also finds that Plaintiffs have shown that a violation of these provisions constitutes a misdemeanor criminal offense. Section 16-452(A) of the Arizona Revised Statutes requires the Secretary to prescribe rules to uphold "procedures for early voting and voting," and it is arguable that the provisions "address[] the procedure for 'voting.'" *Am. Encore*, 152 F.4th at 1117. Section 16-452(C), in turn, provides that a person who violates "any rule adopted pursuant to this section," such as the EPM's rules, "is guilty of a class-two misdemeanor." Even if the provisions fall outside the scope of A.R.S. § 16-452(A), "and [are] not backed by criminal prohibition, [they are] likely still [to] create[] a chilling effect," since "election officials may nonetheless report them to police or remove them from the polling location based on guidance provided in the EPM." *Am.*

*Encore*, 152 F.4th at 1117-18 (citing *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019)). Plaintiffs have therefore shown that their intended conduct is arguably proscribed by the electioneering and apparel provisions.

Finally, Plaintiffs must show a credible threat that the provisions will be enforced. *Driehaus*, 573 U.S. at 159. In the First Amendment context, the inquiry is whether the plaintiff faces a credible threat that the challenged law will be enforced, and the Ninth Circuit "take[s] a broad view of this factor." *Isaacson v. Mayes*, 84 F.4th 1089, 1099-1110 (9th Cir. 2023); *see Am. Encore*, 152 F.4th at 1118. A credible threat does not require a prior prosecution or a specific warning directed at the plaintiff. *Am. Encore*, 152 F.4th at 1118. "[F]actors that may support the reasonableness of a plaintiff's fear of prosecution . . . include: (1) whether the enforcement authorities have communicated a specific warning or threat to initiate proceedings; (2) whether the enforcing authority has disavowed enforcement; and (3) whether there is a history of past prosecution or enforcement." *Id.* (citation modified). "Ultimately, the touchstone of our inquiry is whether Plaintiffs have adduced enough evidence to show that there is a realistic threat that the law in question may be enforced against them." *Id.*

Defendants have not communicated a specific warning or threat to initiate proceedings, and there is no history of past prosecution. But these facts do not preclude a finding that there is a credible threat of enforcement. *See id.* Rather, "Plaintiffs [can] show[] a credible threat of adverse government action by virtue of the enforcement authority delegated by the Secretary to election workers." *Id.* at 1118-19 (citing *Matsumoto v. Labrador*, 122 F.4th 787, 798 (9th Cir. 2024)). The Ninth Circuit has held that the voter-intimidation framework in this manual "presents enough of a collective threat" because it creates "the potential for poll workers to expose individuals to arrest or have them removed from the voting location." *Id.* at 1119.

The same structure is present here. The EPM directs poll worker training "to prevent and promptly remedy any instances of voter intimidation," empowers the marshal to enforce the electioneering ban on election day, and empowers the County Recorder to

enforce it during in-person early voting. (Doc. 21-1 at 2, 4.) As the Ninth Circuit found under substantially similar circumstances, that delegated authority establishes a credible threat of enforcement. *See Am. Encore*, 152 F.4th at 1118-19.

The Court's finding is reinforced by Defendants' refusal to disavow enforcement. In a March 4, 2026, response to Plaintiffs' pre-suit letter, Defendants declined to disavow enforcement of the electioneering and intimidation provisions, stating instead that enforcement "depend[s] on the facts." (*See* Doc. 1-8 at 9.) Nor have Defendants disavowed enforcement of the apparel provision. Instead, a June 19, 2026, letter from Defendants merely purports to state "what the 2025 EPM says or means," by "agree[ing] that a law enforcement officer or military member who shows up to vote in uniform should not be turned away because they are in uniform." (Doc. 39-1.) There is no disavowal of enforcement of the provisions, and a refusal to disavow enforcement supports, rather than undermines, the credibility of the threat. *See Am. Encore*, 152 F.4th at 1118-19; *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021).

Because Plaintiffs intend to engage in arguably protected conduct, the provisions arguably proscribe that conduct, and a credible threat of enforcement exists, an identified member would have standing to sue in their own right. The Party therefore has associational standing to challenge the electioneering and apparel provisions.

### 3. Aggressive-Behavior and Frivolous-Challenge Provisions

The aggressive-behavior provision lists, as conduct that "depending on context, may be considered intimidating," "[a]ggressive behavior, such as yelling at or taunting a voter or poll worker." (Doc. 21-1 at 4.) The frivolous-challenge provision states that "[r]aising repeated frivolous voter challenges to poll workers without any good-faith basis" is conduct that "may be considered intimidating." (*Id.* at 4-5.)

Plaintiffs argue that these provisions chill their exercise of constitutionally protected speech, and that the chill is itself a cognizable injury for purposes of standing. (*See* Doc. 28 at 3.) To demonstrate an injury based on chilled speech, a pre-enforcement plaintiff must show an intention to engage in a course of conduct arguably proscribed by the challenged

rule. *Driehaus*, 573 U.S. at 159. As noted, plaintiffs can show intent with declarations describing past expressive conduct or the conduct in which a plaintiff regularly engages. *Am. Encore*, 152 F.4th at 1114.

Plaintiffs present no evidence of past or regular conduct they would undertake but for these provisions. In fact, the Party's training declarant, Joel Strabala, testified that the Party does not train its observers to raise voter challenges, (Doc. 47 at 95-96), and the Party's training materials direct observers not to "challenge the qualifications of a voter" (Doc. 31 ¶ 6). Nor do Plaintiffs assert that they have or intend to engage in "[a]ggressive behavior, such as yelling at or taunting a voter or poll worker." (*See* Doc. 28.) The Court cannot conclude that the Party intends to engage in a course of conduct arguably proscribed by the challenged rule. *Driehaus*, 573 U.S. at 159. Thus, Plaintiffs have not demonstrated associational standing as to the aggressive-behavior and frivolous-challenge provisions.

### 4.    Organizational Standing

Plaintiffs also assert standing in the Party's own right. (Doc. 28 at 6-9.) Because the Court has found associational standing as to the electioneering and apparel provisions, it need not decide whether the Party is independently injured as to those provisions. *See Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022).

The remaining question is whether organizational injury supplies standing for the aggressive-behavior and frivolous-challenge provisions, where associational standing is absent. An organization may establish injury by showing that a defendant's conduct both drained its resources and caused it to divert those resources from other activities. *Nielsen v. Thornell*, 101 F.4th 1164, 1169-70 (9th Cir. 2024). But an organization "cannot manufacture" standing by spending money to oppose a rule that does not require it to do anything. *All. for Hippocratic Med.*, 602 U.S. at 394.

The Party relies on the time its declarant spends preparing and conducting observer training. (Doc. 31 ¶¶ 3-7.) But the same declarant testified that he would conduct that training "regardless of what the EPM said." (Doc. 47 at 87.) If the Party would train its observers, and spend the same time doing so, whether or not the challenged provisions

exist, then the provisions did not cause the expenditure. *See Nielsen*, 101 F.4th at 1170.

Organizational injury therefore does not supply standing where associational standing is lacking.

Having found that Plaintiffs established injury in fact as to the electioneering and apparel provisions, the Court turns to the remaining elements of standing: causation and redressability. *See Lujan*, 504 U.S. at 560-61.

**B.     Causation**

Defendants argue that any injury is not fairly traceable to the EPM because the harm flows either from the underlying statutes, which Plaintiffs do not challenge, or from the independent decisions of non-party election officials. (Doc. 23 at 14-15.) The injury Plaintiffs assert, however, is the chill arising from the EPM's own enforcement machinery. The manual directs the marshal and inspector to address conduct falling within the challenged provisions, to remove individuals, and to contact law enforcement, and it renders this conduct a class-two misdemeanor under A.R.S. § 16-452(C). (*See* Doc. 21-1.) That an official's exercise of this authority is the immediate cause of any enforcement does not break the chain, because the authority originates in the challenged provisions. *See Am. Encore*, 152 F.4th at 1118 (holding that the threat is traceable to the "universe of potential complainants" charged with applying an EPM provision). The injury is thus fairly traceable to the EPM.

**C.     Redressability**

Defendants' principal argument, pressed in closing argument, is that an injunction against the EPM would not redress Plaintiffs' injury and might worsen it because the underlying voter-intimidation and electioneering statutes are broader than the EPM examples, providing Plaintiffs no relief from the specificity concerns they raise. The argument rests on a premise the Court does not accept at this stage—that the challenged provisions do no more than restate the statutes. As discussed in connection with arguable proscription, Plaintiffs' contrary construction is at least arguable, and Defendants' own election director acknowledged that the audibility criterion is not found in the statutes.

Where the EPM imposes a restriction the statutes do not, an injunction against that restriction provides meaningful relief, even though the statutes survive. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (noting that a plaintiff "need not show that a favorable decision will relieve his every injury"); *Massachusetts v. EPA*, 549 U.S. 497, 525-26 (2007) (holding that partial relief suffices for redressability).

The distinction Plaintiffs made in closing argument reinforces the point. The challenged provisions operate ex ante as they authorize election officials to remove or refer individuals at the polls based on the EPM's own terms. The statutes, by contrast, are enforced ex post, through prosecution where intent and other elements must be proved. An injunction nullifies the ex ante removal-and-referral authority that chills Plaintiffs' protected conduct, regardless of whether the statutes form the basis of an after-the-fact prosecution. That is redress of the injury Plaintiffs assert, not of some different injury.

Plaintiffs have therefore established injury-in-fact, causation, and redressability as to the electioneering and apparel provisions.

## III. PRELIMINARY INJUNCTION

Having found that Plaintiffs have standing to challenge the electioneering and apparel provisions, the Court now addresses whether they are entitled to a preliminary injunction.

### A. Legal Standard

A party facing irreparable harm before the conclusion of litigation may seek preliminary injunctive relief. Fed. R. Civ. P. 65. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation modified). Plaintiffs must make a clear showing on four factors: likelihood of success on the merits, likelihood of irreparable harm, the balance of equities, and the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the government is the non-movant, the third and fourth factors merge. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en

banc).

Likelihood of success is "[t]he most important" factor, especially "for constitutional claims." *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1115 (9th Cir. 2023). Plaintiffs carry an initial burden to show their protected speech is threatened, at which point the burden shifts to Defendants to justify the restriction. *Am. Encore*, 152 F.4th at 1119. Where a plaintiff shows a likely constitutional violation, that showing ordinarily establishes irreparable harm and tips the equities and public interest in the plaintiff's favor. *See Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). If the plaintiff fails to show likely success, the remaining factors ordinarily do not warrant relief. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

These challenges involve a conflict between the right to engage in political speech and the government's authority to regulate order at polling locations. The First Amendment protects political speech such as electioneering near the polls. *See Burson v. Freeman*, 504 U.S. 191, 196 (1992). But a State may decide "that some forms of advocacy should be excluded from the polling place, to set it aside as an island of calm in which voters can peacefully contemplate their choices." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 15 (2018) (citation modified). Defendants may "reasonably take steps to ensure that partisan discord not follow the voter up to the voting booth," even as to displays that "do not raise significant concerns in other situations." *Id.* at 15-16. The limit is that any such rule must rest on "objective, workable standards" and not commit enforcement to an official's unguided judgment. *Id.* at 21. As explained below, the electioneering provision satisfies that requirement and the apparel provision does not.

**B.     Electioneering Provision**

Arizona's electioneering statute provides that no electioneering may occur "within the seventy-five foot limit" of a voting location, and it makes a violation a class-two misdemeanor. A.R.S. § 16-515(A), (H). A companion provision requires polling places to "allow persons to electioneer and engage in other political activity outside of the seventy-five foot limit." A.R.S. § 16-411(I). The EPM incorporates the 75-foot rule and

adds that no electioneering may take place outside the limit "if it is audible from a location inside the door to the voting location." (Doc. 21-1 at 2.) Plaintiffs challenge that sentence as vague, overbroad, and violative of equal protection. (Doc. 12 at 13-20.)

### 1. Likelihood of Success

### i. Vagueness

The Court first addresses Plaintiffs' argument that the electioneering provision is too vague. (Doc. 12 at 15-17.) A law is unconstitutionally vague if it fails to give a person of ordinary intelligence fair notice of what is prohibited, or if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). A facial vagueness challenge must show that a law is impermissibly vague in the great majority of its applications. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494-95 (1982); *cf. Montenegro v. Fontes*, 260 Ariz. 443, 447 (2025) (holding that a facial challenge requires demonstrating the act "cannot be constitutionally enforced under any set of circumstances"). "[P]erfect clarity and precise guidance have never been required," even of laws that restrict speech. *Mansky*, 585 U.S. at 21 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

Plaintiffs rely almost entirely on *Mansky*. In that case, the Supreme Court found that Minnesota's ban on wearing any "political badge, political button, or other political insignia" was too restrictive under the First Amendment. *Mansky*, 585 U.S. at 16-17. In doing so, it held that a State "may choose to prohibit certain apparel . . . because of the message it conveys," but that "the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 16. The Court noted the "confusing line-drawing problems" associated with identifying "political" apparel. *Id.* at 18. According to the Court, enforcing Minnesota's ban would require, among other things, "maintain[ing] a mental index of the platforms and positions of every candidate and party on the ballot." *Id.* at 19.

But determining whether electioneering activity is audible within a polling center is not akin to Minnesota's ban that ostensibly let "an election judge's own politics" shape

what counts as political. *See id.* at 21-22. Whether sound carries to a fixed location is an objective fact. It is true, as Plaintiffs assert, that there may be slight variations in each poll worker's discernment of that fact in various polling locations based on certain conditions, such as whether the door to a polling place is open and whether the design of a building mutes noise. (Doc. 47 at 77-78.) Even if a voter rule is articulated with utmost specificity, the rule will invoke poll workers' individual judgment. For example, an audibility regulation based on a decibel threshold, which Plaintiffs supply as a counterfactual hypothetical, would require a poll worker to interpret which source of sound is associated with each measurement on the decibel meter. This is why the Supreme Court rejected any requirement of "[p]erfect clarity and precise guidance." *See Mansky*, 585 U.S. at 21 (citation modified).

Because the audibility restriction turns on an objective, perceptible fact rather than an official's subjective assessment of a speaker's message, it does not present the kind of discretion that rendered the Minnesota ban unconstitutional. Plaintiffs have thus not shown that the EPM's audibility restriction invites poll workers to import their own judgment such that the restriction is unconstitutionally vague.

### ii.    Overbreadth

Plaintiffs next challenge the audibility restriction as overbroad. (Doc. 12 at 13-15.) A facial overbreadth challenge requires the plaintiff to show that the law "prohibits a substantial amount of protected speech, relative to its plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (citation modified). The unconstitutional applications must be "realistic, not fanciful," and "substantially disproportionate" to the law's lawful reach. *Id.* The doctrine is "strong medicine that is used sparingly and only as a last resort." *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988) (citation modified).

Plaintiffs argue that the audibility requirement is overbroad because it "invites arbitrary and discriminatory enforcement" and "can easily be asserted as a post hoc rationalization for any otherwise unwarranted removal of a speaker." (Doc. 12 at 14.)

Plaintiffs also assert that the provision "places additional restrictions on electioneering greater than those found in A.R.S. § 16-515." (*Id.*) None of Plaintiffs' arguments are material to the Court's assessment of whether the audibility provision is overbroad.

Whether a statute is overbroad depends on its scope, which is a question of statutory interpretation. *Hansen*, 599 U.S. at 770 ("To judge whether a statute is overbroad, we must first determine what it covers."). Whether poll workers will use the provision as a pretext for discriminatory enforcement or a post hoc rationalization is a question properly considered under the doctrine of vagueness, as this Court did above. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (holding that voiding laws for vagueness is, in part, justified by the preventing of arbitrary and discriminatory enforcement). Moreover, Plaintiffs' argument that the EPM extends beyond conduct regulated by A.R.S. §§ 16-411 and 16-515 (*see* Doc. 12 at 14) is immaterial, since the Supreme Court instructs courts to determine whether a regulation is overbroad based on "whether the ordinance sweeps within its prohibitions what may not be punished *under the First and Fourteenth Amendments*." *Id.* at 114-15 (emphasis added). Because Plaintiffs' arguments do not address the breadth of the audibility provision, the Court cannot conclude that Plaintiffs are likely to succeed on their challenge to the electioneering provision as overbroad.

### iii.    Equal Protection

Plaintiffs separately contend that the challenged provisions violate equal protection because, as implemented by different officials, the provisions yield inconsistent results. (Doc. 12 at 17-20.) The theory is derivative of their vagueness argument. As Plaintiffs frame it, a standardless rule is "not merely a First Amendment problem" but "simultaneously an equal protection problem," because it produces inconsistent results across officials. (*Id.* at 18.) That argument depends on the premise that the provision supplies no objective standard, and as explained above, the Court rejects that premise. Because the provision is not standardless, the equal protection theory fails with the vagueness theory on which it rests.

Further, Plaintiffs rely principally on *Bush v. Gore*, 531 U.S. 98 (2000), where the

Supreme Court held that the Florida Supreme Court's order for a manual recount in certain counties, which lacked any standard for treating dimpled or partially punched ballots, did not provide "sufficient guarantees of equal treatment." *Id.* at 106-07. Plaintiffs contend that *Bush v. Gore* stands for a "principle of general applicability" beyond "just the recount context." (Doc. 12 at 17.) But the Court unequivocally stated that its "consideration is limited to the present circumstances." *Id.* at 109. Even assuming *Bush v. Gore* stands for the broader proposition that equal protection forbids election rules producing arbitrary and disparate treatment, it offers no guidance for applying that principle to a rule like this one.

The Ninth Circuit authorities Plaintiffs cite point the other way. In each, the court rejected an "arbitrary and disparate treatment" challenge because the rules were "sufficiently detailed and uniform to pass muster." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1090 n.15, 1095 (9th Cir. 2024); *see Mi Familia Vota*, 129 F.4th at 730-31. The same is true here. As the Court has found, the audibility sentence supplies an objective standard, and Plaintiffs have not shown that the provision is "simply incapable of being enforced in an equal and evenhanded way" or that it produces "different results for similarly situated speakers depending solely on the identity and sensibilities of the enforcing officers." (Doc. 12 at 19.) The electioneering provision does not violate equal protection.

Plaintiffs have therefore not shown a likelihood of success on any theory as to the electioneering provision.

### 2.    Irreparable Harm and the Equities

Plaintiffs' failure to show a likelihood of success on the merits is dispositive. A plaintiff must make a clear showing on all four *Winter* factors, and the inability to establish likely success ordinarily defeats a request for preliminary relief without further analysis. *See Mazurek*, 520 U.S. at 972. The remaining factors do not alter that conclusion here.

To satisfy the irreparable injury element, Plaintiffs' assertion of harm must be grounded in their alleged First Amendment injury. Because the Court finds that Plaintiffs have failed to establish that they are likely to succeed on the merits of their First

- 17 -

Amendment claim, the Court cannot find that Plaintiffs have established that they are likely to suffer irreparable First Amendment injury in the absence of a preliminary injunction. *See Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) (holding that a preliminary injunction was not warranted because the plaintiff failed to show likelihood of success on the merits of the First Amendment claim and demonstrated no irreparable harm); *Comfort v. MacLaughlin*, 473 F. Supp. 2d 1026, 1029-30 (C.D. Cal. 2006) ("Because Plaintiffs' First Amendment claim is unlikely to succeed, the Court does not find that the prohibition on speech is currently causing an irreparable injury.").

Where the government is the non-movant, the balance of equities and public interest factors merge. *Fellowship of Christian Athletes*, 82 F.4th at 695. Because Plaintiffs have not shown the audibility provision is likely unconstitutional, there is no constitutional violation for an injunction to prevent, and the public's interest lies in the orderly administration of the election under the rules already in place, particularly now that early voting has begun. *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). The equities and public interest favor Defendants, and relief as to the electioneering provision is denied.

**C.    Apparel Provision**

The apparel provision lists, as conduct that "depending on context may be considered intimidating," "[i]mpersonating a law enforcement officer or otherwise wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters." (Doc. 21-1 at 4-5.) Plaintiffs do not challenge the prohibition on impersonating an officer. They challenge the "otherwise" clause, contending that, among other things, an election official could treat a bona fide officer's uniform as intimidating and exclude the officer from voting. (*See* Doc. 40 at 3-4.)

**1.    Likelihood of Success on the Merits**

The Court finds that Plaintiffs are likely to succeed on their claim that the apparel provision is void for vagueness. As explained above, *Mansky* held Minnesota's ban on "political" apparel unconstitutionally indefinite because it required election judges to make a subjective classification of the political character of clothing. 585 U.S. at 21. The EPM's

ban on apparel "intended to deter, intimidate, or harass voters" provides even less guidance to officials and voters, because it asks the official not only to judge whether apparel is intimidating but also to discern the wearer's intent.

A regulation that turns on a speaker's "intent to harm or intimidate" does "not provide the person of ordinary intelligence a reasonable opportunity to know" what is prohibited. *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1149 (W.D. Wash. 2003). In *Sheehan*, the court struck as vague a law criminalizing the publication of law-enforcement officers' personal information when done "with the intent to harm or intimidate," reasoning that the intent element required "discern[ing] the subjective intent of the speaker" and so it lacked "objective standards." *Id.* As the court explained, such a provision "invite[s] subjective enforcement when the prosecuting attorney, and then a jury, must discern the subjective intent of the speaker," effectively "licens[ing] [the enforcer] to create [his] own standard in each case." *Id.*

That reasoning applies here. The apparel provision makes liability turn on whether the wearer "intended to deter, intimidate, or harass." Intent of that kind is not observable. An election official cannot read it from the garment, and the manual offers no standard for inferring it from anything else. The intent element thus does not cabin the official's discretion; it relocates the discretion to an even less determinate inquiry into the voter's state of mind. The State's own witness illustrated the problem. Election Director Lisa Marra testified that wearing a uniform alone is not enough to trigger this concern and that a violation depends on the wearer's "actions." But the manual supplies no standard for which actions, paired with which attire, reveal an intent to intimidate. The official is left to "create [his] own standard in each case." *Sheehan*, 272 F. Supp. 2d at 1149 (quoting *Gooding v. Wilson*, 405 U.S. 518, 528 (1972)).

The defect is compounded by the provision's undefined terms. In *American Encore*, the Ninth Circuit faulted the 2023 Speech Provision in part because it "include[d] the undefined term 'harassing,' which may also encompass a broad range of activities that are viewed as insulting or offensive." 152 F.4th at 1117. The same term appears here, equally

undefined. To "harass" has no fixed meaning in this context, and an official applying it must decide, without guidance, whether a given uniform or shirt is meant to harass rather than merely to express. Consider a sheriff's deputy who votes in uniform on the way to work, a veteran in a flight suit, or a voter in a shirt bearing a pointed political slogan. Whether any of these is "intended to . . . harass voters" depends entirely on the impression it makes on the particular official at the particular polling place. That is the eye-of-the-beholder standard *Mansky* forbids. *See* 585 U.S. at 20.

Defendants argue that other manual language clarifies the target, because voters and their assistants may wear clothing with political messages, so the apparel example must be aimed at dress that falsely implies legal authority the wearer lacks. (Doc. 23 at 19.) But even accepting that the provision targets dress implying false authority, the official must still determine whether a given uniform conveys that implication and whether the wearer intended it, the same subjective judgments that render the provision vague.

Defendants further contend that Plaintiffs offer no evidence the provision has ever been enforced arbitrarily. (*Id.* at 18.) But a facial vagueness challenge in the First Amendment context does not require a history of arbitrary enforcement. The chilling of protected expression by an indeterminate, speech-restricting rule is itself the injury. *See Mansky*, 585 U.S. at 21 (holding that an indeterminate prohibition carries "[t]he opportunity for abuse"). A voter need not first be turned away to challenge a rule that leaves him guessing whether his attire is permitted.

Defendants argue that enjoining the provision is pointless, because doing so would leave in place the underlying voter-intimidation statutes, which are no more specific. (Doc. 23 at 18.) The challenged provision is an enforcement instrument the EPM places in the hands of front-line officials, who are directed to address conduct within the § III.D examples and may remove voters or summon law enforcement on that basis. The statutes, by contrast, are enforced after the fact through prosecution, in which intent and the other elements must be proved. Whether the statutes are themselves vague is not before the Court. Enjoining the apparel provision removes the standardless, point-of-voting discretion

that chills protected conduct, which is meaningful relief regardless of what the statutes provide.

Because the provision makes the lawfulness of a voter's attire depend on a poll worker's unguided assessment of the voter's intent, it fails to give fair notice and invites discriminatory enforcement. Plaintiffs have therefore shown a likelihood of success on their vagueness claim, and the first *Winter* factor is satisfied as to the apparel provision. Because that showing suffices, the Court does not reach Plaintiffs' overbreadth or equal protection theories as to this provision.

### 2.      Irreparable Harm

The deprivation of First Amendment freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). A finding of likely irreparable harm "follows inexorably" from the conclusion that a rule is likely unconstitutional. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017). Because Plaintiffs are likely to succeed on their vagueness claim, they have shown irreparable harm.

### 3.      Balance of Equities and Public Interest

These factors merge and favor Plaintiffs. Defendants have no legitimate interest in enforcing a likely-unconstitutional provision, and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird*, 81 F.4th at 1042 (citation modified).

The Court has weighed the *Purcell* principle, under which federal courts "should ordinarily not alter the election rules on the eve of an election." *Am. Encore*, 152 F.4th at 1121 (citation modified). The Court recognizes that early voting has begun. But the Ninth Circuit rejected the same *Purcell* argument as to a materially similar EPM provision in this manual's prior litigation, and its reasoning governs. *See id. Purcell* "did not set forth a per se prohibition against enjoining voting laws on the eve of an election"; a court must assess "the particular circumstances of each case in light of the concerns expressed by the *Purcell* court." *Id.* (quoting *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 368 (9th

Cir. 2016)).

Those concerns are not present here. As the Ninth Circuit explained, an EPM provision that "regulates the type of speech and conduct that individuals may engage in around voting places" "does not affect the state's election processes or machinery," and so an injunction against it "does not involve any change at all to the actual election process." *Id.* (citation modified). The apparel provision is such a rule. Enjoining its enforcement changes no ballot, deadline, precinct, or voting procedure. It requires officials only to refrain from applying a clause the Court has found likely unconstitutional, which imposes no administrative hardship and disturbs no longstanding procedure. *See id.*; *Merrill v. Milligan*, ⸻ U.S. ⸻, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (reasoning that *Purcell* may be overcome where the change is "feasible before the election without significant cost, confusion, or hardship").

Accordingly, the equities and the public interest favor the narrow relief the Court grants.

### 4.    Scope of Relief

An injunction must be no broader than necessary to remedy the violation it addresses. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992). Plaintiffs' proposed order asks the Court to enjoin Section III.D in full and to order the Secretary to promulgate a new EPM or issue a statewide non-enforcement directive. (Docs. 12 at 24.) In reply, Plaintiffs narrowed the request to the specific challenged examples. (Doc. 28 at 13.)

The Court tailors relief accordingly and enjoins Defendants only from enforcing the clause of Section III.D prohibiting "wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters" during the pendency of these proceedings. The Court declines Plaintiffs' broader requests; an injunction against enforcement of that clause is sufficient to remedy the violation shown, and whether to amend the manual is for the Secretary in the first instance.

### 5.    Federal Rule of Civil Procedure 65(c) Security Bond

The Court will waive Federal Rule of Civil Procedure 65(c)'s security bond requirement. That rule states that courts may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The district court has discretion "as to the amount of security required, *if any*" and "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citation omitted).

The injunction will restrain Defendants only from enforcing a single provision and imposes no monetary obligation. Any steps needed to implement it are ordinary costs of compliance, not the harm from wrongful restraint that Rule 65(c) security covers. Defendants have not requested a bond or identified any such harm. The Court therefore waives the requirement. *See id.*

## IV.    REMAINING MOTIONS

Plaintiffs move to have the Court recognize Defendants' June 19, 2026 letter as a binding admission or, alternatively, to admit it into evidence. (Doc. 40.) The motion is granted in part and denied in part. The letter was admitted into evidence at the hearing, so the alternative request is granted. The request to treat the letter as a binding admission of the provision's meaning is denied, because the Court's resolution of the apparel provision rests on the facial vagueness of the provision's text and does not depend on the letter or on how it is characterized.

Plaintiffs also move for leave to serve an expedited subpoena on the Tucson Police Department for documents concerning a recent policy on officers voting while armed. (Doc. 48.) A party seeking expedited discovery before the Rule 26(f) conference must show good cause. *See* Fed. R. Civ. P. 26(d)(1); *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002). Good cause is absent here. A facial vagueness challenge is assessed from the text of the challenged provision, not from any instance of enforcement

or any third party's internal policy. The requested documents therefore would not bear on the Court's resolution of the apparel claim, and the motion is denied.

## V.    CONCLUSION

Plaintiffs have established standing to challenge the electioneering and apparel provisions and lack standing to challenge the aggressive-behavior and frivolous-challenge provisions, which the Court does not reach on the merits. On the two provisions properly before it, the results differ. Plaintiffs are unlikely to succeed on their challenge to the electioneering provision but are likely to succeed on their challenge to the apparel provision. The remaining preliminary injunction factors favor relief as to the apparel provision and disfavor it as to the electioneering provision.

This ruling is preliminary. It reflects the Court's assessment of the record on a motion for preliminary injunction and does not finally resolve the merits of Plaintiffs' claims, which remain for further proceedings.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 12) is **GRANTED IN PART AND DENIED IN PART**. The Motion is **GRANTED** as to the apparel provision and **DENIED** as to the electioneering, aggressive-behavior, and frivolous-challenge provisions. Pursuant to Federal Rule of Civil Procedure 65, Defendants, and those acting in concert with them, including county election officials, are enjoined from enforcing the clause of EPM Chapter 9, Section III.D prohibiting "wearing clothing, uniforms or official-looking apparel intended to deter, intimidate, or harass voters" during the pendency of these proceedings. This preliminary injunction does not reach the prohibition on impersonating a law enforcement officer or any other provision of the manual. The security requirement under Federal Rule of Civil Procedure 65(c) is waived.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Recognize Admission (Doc. 40) is **GRANTED IN PART and DENIED IN PART**, as set forth above.

. . . .

. . . .

**IT IS FINALLY ORDERED** that Plaintiffs' Motion for Leave to Serve an Expedited Subpoena (Doc. 48) is **DENIED**.

Dated this 9th day of July, 2026.

_Michael T. Liburdi_
Michael T. Liburdi
United States District Judge